# United States Tax Court

T.C. Memo. 2026-19

NORTH DONALD LA PROPERTY, LLC, NORTH DONALD LA
INVESTORS, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 24703-21.                    Filed February 19, 2026.

_____

*Byung Hyuk Min, Sarah L. Ray, Kristin Martin Centeno, Ronald A. Levitt, Brian E. Derdowski, Frank Agostino, Olla F. Jaraysi, Gregory P. Rhodes, Michelle A. Levin, Sarah E. Green, Sidney W. Jackson IV*, and *Emily C. Ellis*, for petitioner.

*Richard L. Wooldridge, Richard J. Hassebrock, Andrew Yamanaka Belter, Peter N. Tran, Gary R. Shuler, Allison N. Kruschke, Lynn M. Barrett, Daniel T. Gaffney, Alexandra E. Nicholaides*, and *Kerrington A. Hall*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: This is a syndicated conservation easement (SCE) case with a fact pattern that will sound familiar. North Donald LA Property, LLC (North Donald), donated an easement over farmland in rural Louisiana (North Donald Tract). The property was acquired in March 2016 for $2,975 per acre. That approximated the going rate for similar property in the neighborhood during 2015–2020.

On its Federal income tax return for 2017, North Donald claimed for this donation a charitable contribution deduction of $115,391,000. It asserted that the "before value" of the farmland—its value before being

[*2] encumbered by the easement—was $439,492 per acre.  It thus took the position that the land had appreciated by more than 14,000% in 21 months.

The appraisal accompanying the return asserted that the "highest and best use" (HBU) of the farmland was development as a clay mine or "borrow pit."  To determine the "before value" of the land, the appraiser hypothesized—and discounted to present value—the stream of royalty income that supposedly could be derived from leasing the land to a mine operator for 12 years.

The property's zoning classification permitted only agricultural use.  Petitioner failed to establish a reasonable probability that the land could be rezoned to permit use for clay mining.  Because mining was not a legally permissible use, it was not the property's HBU.  Assuming arguendo that rezoning approval could have been secured, petitioner failed to prove that a clay borrow pit would have been financially feasible, given the high transportation costs to levee construction sites and the high cost of securing wetland "mitigation credits."  We find that the property's HBU was continued use for agricultural purposes.

We conclude here, as we did in *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at *3, that the valuation of the conservation easement "was an outrageous overstatement," wholly untethered from reality.  Employing the comparable sales method, as backstopped by the price actually paid to acquire the property in March 2016, we find that its "before value" was $2,975 per acre and that its "after value" was $2,300 per acre.  The delta between these figures—the reduction in value attributable to the easement—is $675 per acre.  The value of the easement—and hence the allowable charitable contribution deduction— is thus $175,824 ($675 × 260.48 = $175,824).

North Donald claimed $1,157,469 of "other deductions" on its 2017 return.  This sum included a $1,055,000 "consulting fee" paid to the promoter that marketed the conservation easement to investors and $50,000 paid to a law firm that served as a "material advisor" to the SCE transaction. We find that these expenses constituted nondeductible syndication costs and that the rest of the "other deductions" must also be disallowed.

Notwithstanding North Donald's explicit disclosure of the SCE transaction on its return, respondent has asserted the section 6663 civil

[*3] fraud penalty.[1]  We agree that the conduct in which some of the principals engaged was disreputable and often suspect.  But given the unambiguous disclosure on the face of the return, we find that respondent has not carried his heavy burden of proving, by clear and convincing evidence, that the underpayment of tax required to be shown on the return was attributable to fraud.  However, because the value claimed on the return ($115,391,000) grotesquely exceeded the value of the easement ($175,824), North Donald is liable for the 40% gross valuation misstatement penalty.  *See* § 6662(a), (h).  We hold that it is also liable for a 20% penalty on the portion of the underpayment attributable to the disallowed "other deductions."

## FINDINGS OF FACT

The following facts are derived from the pleadings, five Stipulations of Facts with attached Exhibits, numerous Trial Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial.  North Donald is a Missouri limited liability company (LLC) classified as a TEFRA partnership for its taxable year ending December 31, 2017.[2]  Petitioner North Donald LA Investors, LLC (North Donald Investors), is its tax matters partner (TMP).  North Donald had its principal place of business in Missouri when the Petition was timely filed.  Absent stipulation to the contrary, appeal of this case would appear to lie to the U.S. Court of Appeals for the Eighth Circuit.  *See* § 7482(b)(1)(A).

I.     *The Donald Farm*

Jefferson Davis Parish (Parish) is in southwest Louisiana not far from the Texas border.  The Parish had a population of about 32,000 in 2020.  Jennings, the parish seat, had roughly 11,000 residents.  Welsh, the next-largest town, had about 2,300 residents.  Both are about 140 miles from New Orleans.

Beginning in the 1950s the Donald family began acquiring farmland about six miles south of Welsh.  Their property eventually

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round most monetary amounts to the nearest dollar.

[2] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit process for many partnerships, including North Donald.

[*4] encompassed 3,324 acres and became known as the Donald Farm. The property is typical of coastal Louisiana, consisting of low-lying fields and wetlands. The highest point on the property is five feet above sea level.

For decades, the acreage constituting the Donald Farm has been used for farming soybeans, crawfish, and rice. From 1973 through 2016 the Donald family farmed the land in what amounted to a joint venture with the family of Roger Benoit. The Donald family owned the land, the Benoit family supplied the agricultural labor, and each family contributed a portion of the required materials (such as seeds and fertilizer). In recent years David Donald managed the farm for his family.

As the farm manager David knew that a great deal of clay underlay their property and nearby agricultural land. The family's original plan was to try growing soybeans and rice. They found that soybeans fared poorly because the clay was close to the surface and hindered the development of root systems. But the heavy base of clay was useful for rice farming because it helped keep the paddies full of water. The families would alternate growing rice with farming crawfish, which would feed on the stubble after the rice had been harvested. Again the clay soil was useful because the crawfish needed surface water.

Growing rice and farming crawfish required that the property be seasonally flooded. To keep the land flooded, the Benoits used clay from the property to build canals through which water could be pumped from the adjoining wetlands. Other landowners in the area, when needing clay for agricultural purposes, likewise used clay from their own land. David knew of no commercial source for clay anywhere in the Parish. He did not find that surprising, because he thought there was no market for it: Most people who needed clay already had it.

The Donalds were a prominent family in the Parish, and David and his brother Dan were sophisticated businessmen. Apart from their landholdings, they served on the board of a local bank and owned a car dealership in Jennings. Had they believed the Donald Farm could be economically exploited as a clay mine, they had the financial resources to commission exploratory drilling, as they had previously done for oil and gas on the property. When asked at trial why they did not explore for clay, David Donald said, in effect, "We knew we had plenty of clay." Mr. Benoit echoed his observation: "Everybody knows there's clay in that part of the country . . . You don't have to go far to find clay."

[*5] II.  *Enter Sixty West*

Sixty West, LLC (Sixty West), is an entity headquartered in Dexter, Missouri.  Describing its business as "helping our clients reduce their tax liability," it specialized in transactions that offered tax credits and other tax benefits to investors.  Its corporate slogan was "[i]nvesting in your own tax liability is good business."

Sixty West began offering SCE transactions in 2016, discharging functions commonly regarded as being performed by a "promoter."[3]  The principals responsible for its SCE business were Matt Mills and Steve Holden; Mr. Mills appears to have been the chief decisionmaker.  Sixty West conducted its SCE business through a subsidiary called Legacy Land Holdings, LLC.  For simplicity, we will sometimes use the term "Sixty West" to refer to the parent company and its subsidiaries.

Sheryl Manuel is a real estate broker in Jennings.  She has been a licensed real estate agent since 2009, concentrating her practice in the Parish.  In early 2016 she informed David Donald that Sixty West was interested in buying the Donald Farm.  She introduced the Donald brothers to Steve Lacy, who worked for Sixty West.  Mr. Lacy functioned as Sixty West's principal "boots on the ground" in the Parish.

On behalf of Sixty West, Mr. Lacy offered to buy the Donald Farm for $2,975 per acre.  Ms. Manuel said she was "pretty impressed" with this offer.  She explained that the price for agricultural property in the Parish was quite stable from 2015 through 2020, climbing only "a little bit" during that period.  She listed a dozen factors that affect the prices paid for land in the Parish.  The factors she listed did not include the presence of clay.

The Donalds asked an appraiser to pull together a market study of sale prices for land in the Parish.  Those prices ranged from $2,200 to $2,700 per acre.  Concluding that the offering price of $2,975 per acre was generous, the Donald family decided to consummate the sale, retaining subsurface oil and gas rights.  On March 23, 2016, they sold the 3,324-acre farm to the Reserve at Welsh, LLC (Reserve at Welsh), an

---

[3] "Promoter" is sometimes viewed as a loaded term in the tax world because of the penalty imposed by section 6700(a) for "promoting abusive tax shelters."  In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether the activities of Sixty West or others would subject them to risk of a civil penalty under section 6700(a), a question that is not before us.

[*6] entity controlled by Sixty West, for roughly $9,888,000, or $2,975 per acre.

Reserve at Welsh financed its purchase of the Donald Farm with a loan from Sterling Bank. Steve Holden, one of Sixty West's principals, was a cofounder of Sterling Bank. In connection with this loan the bank secured a fair market value (FMV) appraisal from Aaron Bunting.

Mr. Bunting's assignment was to determine the price a willing buyer would pay a willing seller for the property, both having reasonable knowledge of relevant facts and neither being under any compulsion to buy or sell. Concluding that the property's HBU was agricultural, Mr. Bunting determined, using comparable sales, that the FMV of the 3,324-acre tract was $10,294,428, or roughly $3,097 per acre. When asked at trial why he believed that agricultural use was the property's HBU, he said that he "didn't see any influences around it . . . to be other than ag land."

Reserve at Welsh later refinanced a portion of the Sterling Bank loan with a mortgage loan from First Guaranty Bank. In connection with this loan, that bank secured an appraisal from T. Scott Davis, an appraiser from Southern Skies Appraisal Service. Mr. Davis had decades of experience valuing real property in Louisiana, typically performing 10 to 15 property appraisals in the Parish annually.

Mr. Davis's appraisal, dated July 25, 2017, covered 2,378 acres (or 72%) of the Donald Farm. He concluded that the HBU of this acreage was agricultural and determined its FMV using comparable sales of agricultural land. On that basis he concluded a value of $6,658,500, or $2,800 per acre, for the 2,378-acre parcel.

Working through Mr. Lacy, entities affiliated with Sixty West acquired during 2016 two other farms in the Parish—the Houssier Farm and the Theriot Farm (sometimes called the Watkins Farm). Sixty West paid $3,000 per acre for the Houssier Farm, which comprised roughly 2,000 acres adjacent to the Donald Farm. Sixty West paid $2,850 per acre for the Theriot Farm, an 800-acre tract that Ms. Manuel described as being "a little bit further up the road" from the Donald Farm.

III. *Reimagining Clay*

Sixty West planned to use the acreage within the Donald Farm, the Houssier Farm, and the Theriot Farm for SCE transactions. For each transaction Sixty West would allege that the HBU of the property

[*7] before placement of the easement was clay mining.  Sixty West ultimately sponsored or co-sponsored 13 SCE transactions involving land carved from the Donald Farm.  For charitable contribution purposes, the aggregate value that the 13 partnerships placed on that land was $989,105,000—100 times the March 2016 purchase price for the 3,324 acres ($9,888,000).  The configuration of the 13 parcels carved from the Donald Farm is shown below:



For the initial SCE transaction, Sixty West intended to use a 1,019-acre parcel carved from the Donald Farm.  In March 2017—before any exploratory drilling had been done—Scott Moore, a consultant to Sixty West, estimated that a conservation easement on the 1,019-acre parcel could be valued at $233 million, or roughly $233,000 per acre.  He presupposed that the land would be appraised using the "royalty income method."  This appraisal method hypothesizes that the landowner would lease the land to a mine operator and determines its "before value" by calculating the discounted present value of the royalty income the

[*8] landowner might receive from the operator. Mr. Moore assumed that the landowner would receive a royalty of $10 per ton for the clay.[4]

Addressing the capital to be raised from investors, Mr. Moore assumed a "4.5:1 ratio." In other words, he assumed that investors in the SCE transaction would be offered a charitable contribution tax deduction of $4.50 for every dollar invested. He indicated that the offering could thus raise "+/−$52 million" from investors ($233 million ÷ 4.5 = $51.8 million). After Mr. Mills indicated that "[w]e have to go way smaller on these [capital] raises," Mr. Moore reduced his value estimate for the 1,019-acre parcel to $100.3 million.

As of March 2017 Mr. Mills had decided that the royalty income method would be used to determine the "before value" of the parcels on which conservation easements would be placed. Mr. Mills regarded this method as attractive because it had few moving parts. In his view there were just three main variables—the price per ton, how many tons would be purchased, and how quickly those tons would be purchased.

In an email to Mr. Moore in March 2017 Mr. Mills stated: "If we have a royalty deal we don't have hardly any work to do because the royalty contract will outline the amount they'll buy per year. Royalty is a very clean way to go from a CE [conservation easement] standpoint." Mr. Moore replied: "I like the idea of using the royalty value for this deal." While agreeing that "the royalty value will be more than sufficient," Mr. Moore noted that "we will need documentation from the group willing to pay the royalties regarding their process and timing." In May 2017 Mr. Mills told Messrs. Moore and Holden: "We need to do Royalty even if we have to leave money on the table."

IV. *Exploratory Drilling on the Donald Farm*

Reserve at Welsh retained Diversified Enviro Products and Services (DEPS) to do exploratory drilling on the Donald Farm. DEPS initially took soil borings to a depth of 10 feet. On the basis of these borings—and nothing else—Mr. Moore in May 2017 predicted that a

---

[4] The expert and fact witnesses who testified at trial sometimes quoted prices for clay per cubic yard, sometimes per ton. The exact relationship between the two forms of pricing will depend on the water content of the clay and on whether it is "loose" or "compressed." As a rule of thumb, industry participants generally regard a cubic yard of compressed clay as weighing about one ton. In this Opinion we will treat the price per ton and the price per cubic yard as being roughly equivalent.

[*9] conservation easement on an 800-acre parcel carved from the Donald Farm could be valued at $38.4 million.

Mr. Moore explained to Messrs. Holden and Mills that they would "be into the water table at 12' to 15', so any soil removal below that point will become problematic." In April 2017 Mr. Moore asked DEPS to drill soil borings down to 50 feet. DEPS then solicited a bid from Tolunay-Wong Engineers (TWE) to perform a soil evaluation study.

TWE was informed that the property was being considered for development as a 200-acre "clay borrow pit." A "borrow pit" refers to any form of mining in which earthen material (e.g., clay, dirt, sand, or gravel) is taken ("borrowed") from one location for use at another location.

TWE was told that the clay from the hypothetical borrow pit was proposed for use in levee construction projects undertaken by the U.S. Army Corps of Engineers (USACE) to enhance hurricane flood protection along the Louisiana coast. TWE was initially informed that the borrow pit was expected to be 45 feet deep and that bore drillings up to 50 feet would be required. It was asked to assess whether the clay on the property would meet USACE standards for use in levee projects.

In its final report dated June 17, 2017, TWE noted that the sediments in the Parish and surrounding areas were deposited largely during the Pleistocene Epoch, a period that included the last ice age and ended about 11,700 years ago. Sediments in "Pleistocene terraces," TWE explained, are encountered at or near the ground surface and "are similar in depositional composition in that they were deposited by systems of coalescing fluvial and deltaic systems." The soils in Pleistocene terraces are typically "light gray to light brown clay, sandy clay, silt, sand and some gravel." This type of soil is pervasive in the Parish and elsewhere in coastal Louisiana.

TWE drilled 23 soil borings to assess the "subsurface soil and groundwater conditions" on the 1,019-acre parcel. Seven of these borings were on land within the North Donald Tract. TWE drilled 9 borings to a 30-foot depth and 14 borings to a 50-foot depth.

At Sixty West's request, 5 of the 50-foot borings were later extended to a 100-foot depth, "with limited sample analysis to control cost." As DEPS explained in an August 2017 email, the decision to drill borings down to 100 feet was made to "give more credence for Edmundo [Laporte] . . . to support the projected valuations." Mr. Laporte had been

[*10] retained to perform mining feasibility studies for hypothetical clay borrow pit operations on properties carved from the Donald Farm.

After performing a laboratory analysis of the borehole samples, TWE concluded that "average soil properties within the upper 80-ft depth appear to conform to USACE Clay Specification requirements" for plasticity, sand content, organic content, and soil salinity. TWE also analyzed the groundwater content of the soil. During its investigation TWE encountered groundwater at depths ranging from 0.0 feet (the surface level) to 17.8 feet. "[The] in-situ moisture content of the soil samples ranged from 12.0% to 57.3%, with an average of 27.6%." TWE accordingly recommended that "borrow source considerations such as existing groundwater levels, in-situ soil moisture contents, [and] moisture-density relationships . . . within a proposed borrow depth should be evaluated." Patrick Kenney, a co-author of the TWE report, stated that Sixty West never followed up on this recommendation.

V.    *Enter EvrSource*

Matthew Campbell began promoting SCE transactions in 2010 or earlier. He initially used EvrGreen Management, EvrGreen Capital, and related entities for this purpose. Mr. Campbell and his entities had sponsored roughly 50 SCE deals as of 2016.

The EvrGreen entities were eventually replaced by EvrSource Capital, LLC (EvrSource). Mr. Campbell and Mark Pickett were its original owners, but in 2016 they brought in Eugene "Chip" Pearson as a 1% member. During the ensuing three years Messrs. Campbell and Pickett gradually transitioned ownership of EvrSource to Mr. Pearson.

In early 2017 EvrSource commenced plans for an SCE transaction involving a tract of land (Diaz property) in St. Bernard's Parish, near New Orleans. They intended that this would be a "clay deal," i.e., that the property's alleged HBU before placement of the easement would be as a clay borrow pit. The Diaz property was "right next to" the levees that were being repaired by USACE after Hurricane Katrina, which had devastated New Orleans 12 years previously.

EvrSource engaged Atlantic Coast Conservancy (ACC) to serve as the land trust and Sequence Financial (Sequence) to serve as the managing broker-dealer for an SCE offering on the Diaz property. It engaged Claud Clark III to do the appraisal and Edmundo Laporte to perform a mining feasibility study. In due course Mr. Laporte prepared a feasibility study that valued the Diaz property at $163 million to $212

**[\*11]** million, assuming as its HBU a hypothetical clay borrow pit operation.

A problem arose with the Diaz transaction when EvrSource discovered an outstanding judgment lien against that property. Facing a likely gap in its 2017 syndication schedule, EvrSource looked for a replacement transaction. Mr. Campbell had met Mr. Mills earlier in 2017 and knew that the latter was considering a clay deal for the Donald Farm property. Mr. Campbell contacted him and said that EvrSource had a "clay team" ready to go—viz., Mr. Laporte, Mr. Clark, and ACC. Mr. Campbell suggested that they collaborate on an SCE transaction, and Mr. Mills agreed to this plan.

On June 7, 2017, Mr. Mills forwarded to EvrSource Mr. Moore's $100.3 million value estimate for the 1,019-acre tract proposed to be carved from the Donald Farm. *See supra* p. 8. Mr. Mills described this estimate as "[c]onservative numbers for Louisiana." In response Mr. Campbell introduced Mr. Mills to Mr. Laporte, recommending him as a plausible candidate for preparing the mining feasibility study.

Six days later Mr. Moore informed Mr. Laporte: "We are confident that the testing will show that we have clay on the property that is capable of being certified to [meet] USACE standards for levee construction in Louisiana." One week later, before receiving any technical information about the Donald Farm, Mr. Laporte indicated during a meeting with Sixty West that "we should be able to get the valuation up to $150M and possibly better."

Sixty West engaged Mr. Laporte on June 23, 2017. In executing the engagement letter Mr. Laporte indicated that he would analyze the Donald Farm property and "demonstrate that it is suitable for the development of a clay mining operation." He indicated that "[i]t will be the same type of detailed document that we have prepared for Matt Campbell in the past." That statement referred to the mining feasibility study Mr. Laporte had prepared earlier in 2017 for the Diaz property, which he valued as high as $212 million as a hypothetical clay borrow pit.

Shortly after engaging Mr. Laporte, Sixty West approached Mr. Clark about preparing appraisals for the conservation easements proposed for the Donald Farm acreage. By email dated August 4, 2017, Mr. Clark informed Mr. Mills: "I am charging the guys on the other clay project [viz., the Diaz property] $100,000 for a royalty method [appraisal]."

[*12] By letter dated September 19, 2017, Mr. Clark was engaged by Sixty West for a fixed appraisal fee of $100,000.

VI.   *Carving Off the North Donald Tract*

Sixty West initially hired Mr. Laporte to perform a feasibility study for a clay borrow pit on a 1,019-acre parcel proposed to be carved from the Donald Farm.  But on July 12, 2017, Mr. Mills asked Mr. Laporte to recommend a way to "split [this] tract into 3 separate clay pits." Mr. Laporte replied that doing this would "reduce the total volume of clay to be extracted."  Mr. Mills expressed no concern on that front, explaining that he "need[ed] to look at it from a total [capital] raise standpoint."  This explanation appears to mean that Mr. Mills believed it would be easier to raise money from investors in several smaller SCE offerings than in one large SCE offering.

Mr. Laporte initially advised against planning multiple clay mines on multiple tracts in the same vicinity "because we would cause a market saturation."  But he later changed his mind.  "We build a firewall between each one of these projects," he explained, "as if we were looking at each one of them with fresh eyes."

Six days later, on July 18, 2017, Mr. Laporte sent Mr. Mills "rough estimates" of values for the 1,019-acre parcel, which was now proposed to be divided into 4 tracts, each with a supposed HBU as a clay borrow pit.  Mr. Laporte observed that a 4-tract scenario "would give more palatable project sizes."  He determined an aggregate value of $588.4 million for the four tracts, with individual tract values ranging from $142.7 million to $151.1 million.

Tract #4, comprising 260.48 acres, would become the North Donald Tract.  Mr. Laporte's initial "rough estimate" was that the North Donald Tract could be valued at $142.8 million, or $536,842 an acre, if used as a clay borrow pit.  Messrs. Campbell and Mills agreed to collaborate on an SCE transaction using this tract, with Sixty West (via Reserve at Welsh) serving as the landowner and EvrSource as the "sponsor."

VII.   *Zoning Matters*

A "police jury" serves as the zoning board for the Parish.  A landowner desiring to change the zoning classification of his property must submit an application to the police jury, which would hold a public hearing.  To notify the public, Parish staff would post signs on the property

[*13] and advertisements in the Jennings newspaper. At the hearing the applicant would present evidence in support of rezoning, and members of the public could express their support or opposition. The police jury would vote to approve or disapprove the rezoning application; in the latter case the applicant had a right of judicial appeal.

The North Donald Tract, like the rest of the 3,324-acre Donald Farm, was zoned A–1 Agricultural. To be used as a clay borrow pit, the land would need to be rezoned to an Industrial classification. Sixty West did not submit a rezoning application to the Parish, and it took no steps toward commencing the rezoning process. Rather, its efforts in this direction consisted of soliciting two letters.

By letter dated September 13, 2017, David Bruchhaus, the general counsel to the police jury, replied to a question about rezoning posed by a Sixty West representative. His letter indicated that, "if your clients are going to create a bar-pit or extract dirt and/or clay to sell or transfer commercially, then they will be required to rezone to I–2 through the normal process." At the time, Mr. Bruchhaus knew that Sixty West had not submitted a rezoning application. At trial he explained that, in drafting his letter, he was "just detailing what the procedure was."

Mr. Bruchhaus's letter noted that "recently dirt pits have been properly rezoned . . . and approved by the zoning commission," observing that these were applications "without opposition." At trial he noted that the other borrow pits ranged from "several acres to many acres," but that they were mostly being exploited on a "dig as you go basis."

Mr. Bruchhaus's letter did not address the possibility of rezoning the North Donald Tract specifically. Indeed, when drafting his letter, he did not know what acreage Sixty West had in mind, only that it was agricultural land. His letter concluded: "Of course all applications are judged on their own merits." Mr. Bruchhaus included this sentence in his letter to ensure that its recipient understood "that this was not just going to be an application that was automatically done."

In September 2017 Sixty West was represented by Morris, Manning, & Martin, LLP (Morris firm), an Atlanta law firm that handled many SCE deals. The Morris firm evidently expressed some concern that the Bruchhaus letter, by itself, did not establish that rezoning of the North Donald Tract was "reasonably probable." Despite "numerous conversations" initiated by Sixty West, Mr. Bruchhaus was unwilling to include the word "probable" in his letter.

[*14] Mr. Holden, one of Sixty West's managers, accordingly solicited a letter from Kevin Millican, its local attorney in the Parish. Mr. Holden asked Mr. Campbell: "[I]f I have [Mr.] Millican add the zoning on his letterhead should it say likely, more likely than not, or something else?" Mr. Campbell replied: "Any or all really." Mr. Millican later invested $40,000 in the North Donald SCE transaction and was allocated a charitable contribution tax deduction of $600,000.

By letter dated October 12, 2017, Mr. Millican stated that he had "been asked to expand on the letter previously provided by David Bruchhaus, as to the requirements for a dirt or bar pit here in Jefferson Davis Parish." "Based on my experience as a local practitioner," he said, "zoning requests of this nature are commonly granted, especially when there is no opposition from adjacent property owners." Because the rest of the Donald Farm was owned by Reserve at Welsh, Mr. Millican surmised that "there will be no opposition from adjacent property owners."

Mr. Millican concluded his letter by stating: "[I]t is my professional opinion that should an application for re-zoning be submitted . . . for the subject property, it is more probable than not that the request would be granted." Mr. Millican adduced no evidence or analysis to support his opinion. Mr. Bruchhaus credibly testified at trial that "Mr. Millican had nothing to do with the Police Jury."

Sixty West supplied the Bruchhaus and Millican letters to Mr. Laporte (for use in his mining feasibility study) and to Mr. Clark (for use in his appraisal). These two letters were the only evidence cited by Messrs. Laporte and Clark to support their conclusions that operation of a clay mine on the North Donald Tract would be legally permissible.

At trial petitioner offered no testimony from any member of the police jury (or other Parish official) about the likelihood that the North Donald Tract, which consisted mostly of wetlands, would be approved for rezoning to industrial use. Petitioner presented no testimony from any local residents on this subject. The only member of the community to address this point—Mr. Benoit, whose family farmed the North Donald property—credibly testified that he would have opposed rezoning of the farm to permit its use as a clay borrow pit.

Bradley Drouant, who has worked for USACE in New Orleans for almost 20 years, testified very credibly at trial. In his experience, it was "not uncommon" for local communities to oppose the creation of clay borrow pits. As he explained: "Sometimes they don't want to have an empty

[*15] hole that fills up with water left over after material was removed. They don't want the traffic that can be associated with 50 or more trucks [coming] out of a borrow pit every day," which can "release debris" and leave "clay on the roads." "A lot of times," he said, "they'll engage their local government representatives and try to stop pits from getting the proper permits or zoning that are required to operate."

VIII.  *Wetlands and Permitting*

As early as April 2017 Reserve at Welsh had been informed that converting the Donald Farm into 13 clay borrow pits could be complicated because "the entire tract can, for the most part, be considered wetlands."  DEPS advised that "site activities would be subject to the full guidelines, responsibilities and parameters" specified in the Clean Water Act and "the appropriate [USACE] Construction Permitting Process."

In July 2017 Reserve at Welsh submitted to USACE a request for a "wetlands jurisdictional determination" for roughly 1,200 acres of the Donald Farm, including the North Donald Tract.  A "jurisdictional determination" is a determination by USACE as to whether "waters of the United States" (actual or potential) lie on the property.  If so, a prospective operator must apply to USACE for a permit before commencing any work that might affect the property's aquatic resources.

In evaluating permit applications USACE generally seeks to determine the alternative that is the "least environmentally damaging," i.e., the least disruptive to aquatic resources.  If there are unavoidable adverse impacts on wetlands, a prospective mine operator would need to purchase "mitigation credits" from a wetlands mitigation bank.  Mitigation credits could cost anywhere from $15,000 to $270,000 an acre.

As Mr. Drouant from USACE explained, the New Orleans District generally avoids sourcing clay from wetlands, both because of the adverse environmental impact and because the cost of purchasing mitigation credits makes the borrow pit uneconomical.  Given the ready availability of clay all along the Louisiana coast, he explained that "[i]t's easier to find somewhere else nearby that's not wetlands." Although USACE has occasionally granted permits for borrow pits in wetlands, "the large majority" are in non-wetlands areas because USACE seeks to "utilize non-wetlands as much as possible whenever [it is] evaluating any project, let alone a borrow [pit] project."

[*16] USACE did not issue a final "jurisdictional determination" until July 2018. In that document it identified nearly all of the North Donald Tract as wetlands subject to USACE jurisdiction.

IX. *USACE Levee Projects*

On its website USACE publishes lists of projects that need clay for levee construction. A prospective supplier must file a "technical submittal" that includes a wetlands jurisdictional determination, any required mitigation plan, and a demonstration that the borrow site has clay suitable for levee construction.

Given the high cost of transporting clay, most borrow pits that supply clay for USACE levee projects are within 10 to 20 miles of the project site. Thirty feet is the typical depth of borrow pits that supply clay for USACE projects. Digging deeper intensifies water infiltration, which increases costs and may render the clay unsuitable for levee construction.

In the wake of Hurricane Katrina, most USACE levee construction occurred fairly close to New Orleans, 140 miles from the Parish. Finding clay that meets USACE standards for levee construction clay "is not exceedingly difficult," as Mr. Drouant testified at trial. That is especially so in rural parishes near New Orleans that have "more undeveloped property."

X. *Draft Mining Feasibility Study*

On August 9, 2017, Mr. Mills informed Mr. Laporte that EvrSource would "be taking over this [SCE] deal as the sponsor." On August 18 Mr. Laporte circulated the first draft of his feasibility study. As previously agreed with Sixty West, he evaluated the feasibility of clay mining on the North Donald Tract using the royalty income method.

Employing that method, Mr. Laporte valued the North Donald Tract at $151.23 million. Mr. Mills's reaction to that figure was "151 mil wow." Or as he put it in an email to the other promoters: "I kinda feel like Jed Clampett on this clay ground." (Jed Clampett was a character in *The Beverly Hillbillies*, a 1960s situation comedy about a family that struck oil on their backwoods farm.)

Mr. Laporte noted that "several areas that are considered wetlands were identified within the property" and that a wetlands delineation was then being considered by USACE. Mr. Laporte assumed that

[*17] North Donald would be able to purchase "wetlands compensatory mitigation credits" to allow a clay borrow pit on the North Donald Tract. His valuation assumed that the cost of purchasing such credits would be $17.95 million.

Mr. Laporte appears to have had no information about prevailing prices for clay in Jefferson Davis Parish and the surrounding area. In his first draft he used the same "tonnage price comps" he had used earlier that year in his clay feasibility study for the Diaz property near New Orleans. Mr. Campbell informed Sixty West that Mr. Laporte "would like to see more local or at least some local comps used."

To fill this gap Sixty West tapped Chris Nobles, who worked with Mr. Lacy as a second pair of "boots on the ground" in Louisiana. Mr. Nobles agreed to solicit, from two truckers he knew, letters purporting to express interest in purchasing clay from Reserve at Welsh. The letters were drafted by Steve Holden (or another person affiliated with Sixty West). The letters were delivered to Mr. Nobles by Ryan Holden (Steve Holden's son) together with a check for $30,000, to be used as needed to secure the desired signatures.

The first letter was prepared for signature by C.J. Lejeune, who owned a small trucking company. Mr. Lejeune was Mr. Nobles's father-in-law. The letter is undated and is addressed to "Steve Holden c/o The Reserve at Welsh." It states the "intent of Lejeune Trucking LLC to purchase [USACE] suitable borrow clay for levee repair and construction in Southwest Louisiana." "The agreed upon price" was said to be "$5.15 [per ton] for depths 0–20 feet, $4.65 [per ton] for depths 20-50 [feet], and $3.75 [per ton] for clay deeper than 50 feet."

Mr. Nobles took this letter to Mr. Lejeune and asked him to sign it. He signed it, and Mr. Nobles later gave him $10,000 for doing so. At trial Mr. Lejeune testified that he had only two trucks and only one other driver. He admitted that he "wouldn't tackle something like" the tonnage volumes Mr. Laporte projected for the hypothetical North Donald borrow pit.

The second letter was prepared for signature by Samuel Papillion, a good friend of Mr. Nobles, who also owned a small trucking company. This letter is dated September 1, 2017, and is addressed to "The Reserve at Welsh, LLC c/o Steve Holden." It states that "Papillion Trucking Co. is interested in purchasing [USACE] suitable borrow clay for levee construction in Southwest Louisiana." While stating that "[t]his letter is

**[\*18]** not a guarantee to purchase clay from The Reserve at Welsh," it recites that "[w]e will pay you $4.72 per ton of suitable clay."

Mr. Nobles took this letter to Mr. Papillion and asked him to sign it, which he did. Mr. Papillion credibly testified that he owned six dump trucks at most, that he employed only two drivers, that he did not know who Mr. Holden was, that he knew nothing about Reserve at Welsh, and that he had engaged in no negotiation over the purchase price for clay. He credibly testified that he had signed the letter as a favor to Mr. Nobles and that he was not paid anything for doing so. Mr. Nobles had originally anticipated paying Mr. Papillion for signing the letter, but he could find no banking records evidencing such a payment.

On September 13, 2017, Mr. Laporte circulated a revised draft of his feasibility study that relied on "the 2 letters of intent we got for this specific project." In this version he presented a range of results in table form, assuming royalty rates for clay between $4.00 and $5.00 per ton and discount rates between 5.5% and 7.5% (to be used in discounting estimated future royalties to present value). He generated values between $105 million and $153 million for the North Donald Tract, depending on the royalty and discount rates used. Employing an "average royalty rate of $4.67/ton" and Sixty West's preferred discount rate of 6.5%, he informed Messrs. Campbell and Mills that "we are talking about $131.63 million," which meant "we are in good shape."

Sixty West forwarded Mr. Laporte's revised draft to Mr. Clark, who was traveling in Italy. He directed two of his analysts to cut and paste relevant portions of the Laporte study into an appraisal template. Mr. Clark had previously received a copy of the Bunting appraisal, and he copied maps from the Bunting appraisal into his own. In determining the "after value" of the North Donald Tract, Mr. Clark's appraisal cited the same comparable sales Mr. Bunting had used. But he ignored Mr. Bunting's conclusion, based on comparable sales, that the "before value" of the property was only $3,097 per acre. *See supra* p. 6.

On September 27, 2017, Mr. Clark's analysts produced a draft appraisal valuing a conservation easement on the North Donald Tract at $115,391,000. Mr. Clark finalized that appraisal in March 2018. *See infra* p. 26. Mr. Noble approached Mr. Clark to prepare similar appraisals for conservation easements on other properties carved from the

[*19] Donald Farm, each of which was assumed to have as its HBU the operation of a clay borrow pit.[5]

XI.     *The Coastal King Clay Mine*

In mid-2016 an entity owned by Mr. Lacy—Sixty West's principal "boots on the ground" in the Parish—acquired 235 acres for development as a commercial borrow pit called Coastal King Clay. This property was located several miles from the Donald Farm. In theory at least, this property was better suited than the North Donald Tract for use as a clay borrow pit because, according to a DEPS employee, it was "better situated, dry, and more cost effective." The purchase price was $5,250 per acre.

Sixty West acquired this property for two reasons. First, as Mr. Mills explained, "it would sure be awesome to have an operating mine in [our] portfolio for IRS purposes." In other words, he thought it might be useful to have a "show mine" in the neighborhood to lend support to Sixty West's position that clay mining in the Parish was commercially feasible. Second, he believed that a nearby mine might help convince skittish investors that Sixty West's easement valuations were plausible.

Sixty West hired Mitch Mertens to run the Coastal King Clay mine. Mr. Mertens credibly testified that the mine consistently lost money. Although he "scoured" USACE's listings, he found no USACE levee projects on which to bid. There were only a few small levee projects in the immediate area, and the necessary clay could be sourced on site. Mr. Benoit, who farmed the North Donald Tract, saw "very few" trucks leave the Coastal King Clay site, commenting that "it didn't look like much clay left the pit." Sixty West dug the pit only to a 20-foot depth—the reach of the excavator—whereas the putative mine on the North Donald Tract was supposedly going to be 100 feet deep. Sixty West never made a profit on the mine; by 2022, sales appear to have stopped because of lack of demand.

---

[5] SCE cases involving at least seven adjoining properties have been docketed in this Court; some had appraisals completed by Mr. Clark. *See The Reserve at Welsh, LLC v. Commissioner*, No. 16443-23 (T.C. filed Oct. 18, 2023); *Olivian Holdings, LLC v. Commissioner*, 17137-23 (T.C. filed Oct. 30, 2023); *Abili Props., LLC v. Commissioner*, No. 17241-23 (T.C. filed Nov. 1, 2023); *TYZ Props., LLC v. Commissioner*, No. 17490-23 (T.C. filed Nov. 6, 2023); *Barlan Props., LLC v. Commissioner*, No. 19227-23 (T.C. filed Dec. 6, 2023); *Niblett Farms, LLC v. Commissioner*, No. 5998-24 (T.C. filed Apr. 16, 2024); *Norcave Props., LLC v. Commissioner*, No. 4753-25 (T.C. filed Apr. 14, 2025).

**[\*20]** XII.   *Structuring the SCE Transaction*

The promoters recommended an ownership structure common to many SCE transactions.  A property company or PropCo would be formed, and Reserve at Welsh would transfer the North Donald Tract to the PropCo in exchange for partnership units in it.  An investment company or InvestCo would be formed to raise funds from investors and use that money to purchase the PropCo units held by Reserve at Welsh.  PropCo, now owned largely by InvestCo, would place a conservation easement on the property.  The investors would then receive, through InvestCo, pro rata shares of the tax deduction that PropCo claimed for the easement.

North Donald was organized as the PropCo in August 2017 to hold the North Donald Tract.  When initially organized it was owned 99% by Reserve at Welsh and 1% by a Sixty West affiliate.  On August 17, 2017, EvrSource organized North Donald Investors to serve as the InvestCo.  Its role was to "raise the capital to buy a majority interest in the property."  North Donald Investors was initially owned 100% by EvrSource and its principals, and EvrSource was its original manager and TMP.

At the outset, the "minimum capital raise" for North Donald Investors was intended to be between $19.4 and $20.3 million, depending on whether a 4.7 or a 4.5 deduction-to-investment ratio was offered to investors.  This presupposed that investors would put up enough cash to acquire 79.2% of North Donald.  Assuming that a 4.5 ratio was offered, the minimum capital raise was calculated by taking Mr. Clark's valuation of the easement ($115,391,000), multiplying by 0.792, and dividing by 4.5.  That is: $115,391,000 \times 0.792 \div 4.5 = \$20.3$ million.

EvrSource assembled a "subscription booklet" for distribution to investors.  As in many SCE deals, this document posited three possible scenarios for the North Donald Tract: (1) the development option (convert the property into clay mining operation); (2) the investment option (hold the land for future disposition); and (3) the conservation option (put a conservation easement on the property).  If the development option were chosen, investors were informed that "the rights associated with clay mining will be leased to an operator and PropCo will receive a royalty stream of income from such lease."  Investors were advised that "significant additional funding" above the initial capital raise would be required to implement the development option.

[*21] The promoters retained the Morris firm to provide a tax opinion for the North Donald SCE deal. That document, dated October 16, 2017, offered no opinion as to the appropriateness of Mr. Clark's valuation methodology or conclusions. Rather, the firm's review was limited to technical compliance, i.e., "mak[ing] sure [the appraisal] has all the requisite statements and information that are required by the Code."

The promoters retained Mick Law, P.C. (Mick Law), to provide what they described as a "due diligence" opinion for the North Donald transaction. Sixty West had retained Mick Law to prepare similar documents for 9 other SCE transactions it promoted. Mick Law did not opine on valuation and did not review Mr. Clark's valuation conclusions.

Mick Law observed that Mr. Laporte's feasibility study "does not provide information as to how much clay is already being supplied by present operations within the [relevant local] market." Mr. Laporte's study likewise identified no "clay operator prospects"—that is, companies that might agree to pay a royalty to mine the property—and stated that North Donald's "ability to procure such prospects is unknown." The opinion acknowledged that $17.95 million of "development capital" would be needed to pursue the development option, owing to the need to purchase wetlands mitigation credits. It characterized the source of the needed capital as "not certain."

EvrSource hired Sequence—the broker-dealer it had planned to use for the Diaz SCE offering—to sell the deal to investors. Sequence had handled many SCE deals previously. According to its managing directors, deduction-to-investment ratios between 4:1 and 5:1 were typical for such offerings. The ratio "was everything" to an SCE deal because it set the investors' return on their investment. EvrSource ultimately marketed the North Donald offering as a "clay royalty deal in Louisiana at 4.7," i.e., a deal in which investors would be allocated a charitable contribution tax deduction of $4.70 for every $1.00 invested.

The promoters informed prospective investors that the North Donald deal would include an "audit insurance option." If investors selected this option, the partnership would purchase a tax liability insurance policy. This insurance would be "put in place to protect investors in case the IRS audited and won in tax court. If [the IRS] disallowed or lowered the valuation to a certain level that investors lost their principal[,] the insurance kicks in." Evidently referring to the 3-year period of limitations specified by section 6501(a), the insurance agent

**[\*22]** recommended this policy so the managers could "sleep for the next three years." Sixty West made the arrangements to acquire the policy.

XIII.  *Closing the Deal*

Dozens of other SCE deals were closing at year-end 2017.  Hoping to enable the North Donald deal to achieve its targeted capital raise of $20.3 million, EvrSource switched investors into that deal from other transactions.  In December 2017 EvrSource was also selling a deal called Crestlawn, involving property whose pre-easement HBU was allegedly as a cemetery.  When the Crestlawn deal became "fully subscribed," EvrSource on December 17 moved seven Crestlawn investors into the North Donald deal, telling them that "the ratio is better at 4.7."  When a deal called Kelso failed to make its minimum capital raise, EvrSource switched dozens of Kelso investors into the North Donald deal, explaining that its 4.7:1 ratio was "slightly better" than Kelso's.

North Donald Investors was able to raise only $10,341,950 in the offering, well short of its target.  The promoters accordingly decided that it would acquire only 58% of North Donald, rather than 79.2% as originally planned.  To acquire that 58% interest, North Donald Investors paid $5,998,716 to Reserve at Welsh.

At that point, Reserve at Welsh's basis in the North Donald Tract (its only asset) was $804,232, yielding a basis of $466,455 in a 58% interest. Sixty West, which owned Reserve at Welsh, thus realized a profit of $5,532,261, or more than 1,000%, on this transaction.  The other participants in the offering also profited handsomely.  EvrSource received a $1.05 million "consulting fee," which was described in the subscription booklet as a fee "for services provided to PropCo related to the property." In fact it was a syndication fee for marketing the deal to investors.

Owing to the shortfall in the capital raise, Sixty West was left owning (through Reserve at Welsh) a much larger share of North Donald than it had planned.  And it could not use the gigantic charitable contribution deduction that would be allocated to it as the owner of a 42% interest.  Sixty West therefore organized Welsh Land Investors, LLC (Welsh Land), to make a secondary offering of interests in North Donald.

Welsh Land was a "friends and family" deal offered exclusively to Sixty West insiders.  They were promised charitable contribution tax deductions of $15.00 for every $1.00 invested.  Welsh Land raised $1.9 million from these individuals and used $1.43 million of that sum

**[\*23]** to purchase a 36% interest in North Donald. The remaining 6% of North Donald continued to be held by Sixty West and an affiliate.

In response to a "call to vote" that expired on December 28, 2017, investors holding 99% of the interests in North Donald voted to pursue the conservation option. The only investor who voted to pursue the development option was Mr. Campbell, the co-owner of EvrSource. At trial he testified that he voted this way because he wanted to open a clay mine in the North Donald Tract.

We did not find that testimony credible. As of year-end 2016 Mr. Campbell and his entities had sponsored and invested in more than 50 SCE transactions. In each of these deals investors voted unanimously (or near unanimously) to pursue the conservation option. The North Donald offering had raised only $10.3 million, and Mick Law had advised that another $17.95 million would be needed to pursue the "development option." We find in this case, as we have found in previous cases, that the development option was not a viable economic proposition, but was window dressing designed to obscure the tax shelter nature of the transaction. *See Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*38–39, *aff'd*, 158 F.4th 715 (6th Cir. 2025); *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at \*28, *supplemented by* T.C. Memo. 2024-73. We find that Mr. Campbell voted for the development option, knowing that his vote would make no difference, seeking to foster the appearance that pursuit of the conservation option was not a foregone conclusion.

In response to the "call to vote," the investors also voted in favor of the "insurance option." North Donald accordingly purchased an "Investor 170(h) Liability Insurance" policy underwritten by a syndicate at Lloyd's of London. In exchange for a premium of $653,333, the policy would reimburse investors up for up to $14 million of lost "tax savings" attributable to disallowance of the deduction claimed for donation of the easement. For the policy to pay out, the disallowance would have to be attributable to a "wrongful act" carried out by a third party, such as an appraiser or other person involved in the "due diligence" for the transaction. The funds to purchase the insurance policy were derived from the capital raised in the investor offering.

On December 28, 2017, North Donald executed a deed of servitude granting a conservation easement in favor of ACC, a "qualified organization" within the meaning of section 170(h)(1)(B). The deed was

**[\*24]** recorded the following day. In 2021 the North Donald Tract was sold for $2,500 per acre, subject to the easement and for agricultural use.

XIV. *Final Mining Feasibility Study*

Mr. Laporte's feasibility study is dated September 2017. At the outset he stated that "the objective of this report is to determine the feasibility of establishing a commercial clay mining operation at the [North Donald] property." He explained that his analysis "was carried out to determine the financial feasibility of a conceptual mine plan for extracting and marketing the clay reserves."

Mr. Laporte stated that he would "quantify the resources contained within [the property], design a conceptual mining operation . . . , and test the technical and financial feasibility of the project." He estimated that the property contained 47.07 million tons of clay; assuming a recovery rate of 95%, this translated to salable product of 44.72 million tons. He then created a "pro forma model" to estimate the "Net Present Value (NPV)" of the conceptual mine as of September 2017."

Mr. Laporte assumed that "the clay reserves . . . can last 12 years," so that the annual average production of salable clay would be roughly 3.725 million tons (44,720,000 tons ÷ 12 = 3,726,667 tons). Assuming that the clay could be sold for $10 per ton, he calculated the NPV of the hypothetical mining business as follows:

| Item | Annual Average | $/ton |
|---|---|---|
| Total tons produced | 3,725,000 | |
| Total revenues | $37,250,000 | $10.00 |
| Controllable expenses | 12,419,000 | 3.33 |
| Transportation, taxes & royalties | 17,396,000 | 4.67 |
| G&A expense | 208,000 | 0.06 |
| Total cash cost | 30,023,000 | 8.06 |
| Income before noncash costs | 7,227,000 | 1.94 |
| Depreciation & other noncash costs | 3,080,000 | 0.83 |

| | | |
|---|---|---|
| Taxable income | 4,147,000 | 1.11 |
| Taxes payable | 1,452,000 | 0.39 |
| Net after-tax income | 2,696,000 | 0.72 |
| Operating cashflow | 5,776,000 | 1.55 |
| Net cashflow | 2,870,000 | 0.77 |
| 12-year rate of return | 18% | |
| **Business NPV as of September 2017** | **$9,444,000** | |

In this portion of his study, Mr. Laporte was not evaluating the feasibility of clay mining on the North Donald Tract "using the royalty income method," as he had previously agreed with Sixty West. *See supra* pp. 11–12. Rather, he was estimating the NPV of a clay mining business constructed on the property, treating royalties as one of the expenses incurred in generating the business income (as shown in line 4 of the table above). On that approach, he determined the total NPV of the mining business to be $9,444,000.

In the last two pages of his study, Mr. Laporte abruptly shifted gears to focus on "the prevailing royalty rate price that the mineral owner would receive from a prudent mine operator." He created "a cash flow model of the royalty revenue stream" that North Donald, as the landowner, could supposedly expect to receive during the life of the mine. He presented his results in table form, assuming royalty rates from $4.30 to $5.00 per ton and discount rates ranging from 5.5% to 7.5%.

Mr. Laporte cited three pieces of evidence for his range of royalty rates: the Lejeune and Papillion letters, *see supra* pp. 17–18, and a marketing brochure for the "Big Shake" clay borrow pit near New Orleans. None of these documents supplied credible support for the royalty rates he assumed. As explained more fully below, the Lejeune and Papillion letters, which were solicited by Sixty West, are wholly unreliable. *See infra* p. 40. In any event, the dollar amounts appearing in those truckers' letters were not royalty rates but purported sale prices for finished clay purchased free on board (f.o.b.) mine. The Big Shake sales brochure—which was a marketing tool, not evidence of actual contract

[*26] prices—asserted that the company *could sell* clay for $4 to $6 per ton. The company noted that it had "an obligation to reimburse the landowner . . . $1.50 per ton of material sales." This suggests that the royalty rate was $1.50 per ton.

Mr. Laporte's discount rate analysis likewise had no evidentiary support. He acknowledged that the average discount rate derived from a survey of 21 established mining companies was 11.16%. He acknowledged that discount rates derived from "the sale of operating quarries" ranged from 10% to 15.5%. But he decided that the appropriate range of discount rates for North Donald—owned by investors who knew nothing about mining and were simply purchasing tax deductions—would be 5.5% to 7.5%.

Adopting the assumptions discussed above, Mr. Laporte "opine[d] that the pretax FMV of the subject property is between $110.39 million and $146.68 million, with a most-likely value range between $121.33 million and $135.87 million, based on the average royalty rate of $4.67/ton." He did not explain how this opinion tallied with his earlier opinion that the NPV of a mining business conducted on the North Donald Tract would be only $9.44 million. His calculations assume that the mining operator would receive only $1 of NPV from the mining business for every $14 the landowner received as royalties.

XV. *Mr. Clark's Final Appraisal*

Mr. Clark's final appraisal was dated March 22, 2018. He made two "extraordinary assumptions" in this document: (1) he assumed "that all necessary mining permits and zoning permits would be obtained to operate a mine on the property" and (2) he "relied on the geologist report written by [Mr. Laporte]."

Mr. Clark acknowledged that the North Donald Tract had been purchased less than two years previously for $2,975 per acre. But he declined to use that sale, or any other property sales data from the Parish, in determining the "before value" of the property. "The sales comparison approach," he said, "is most reliable when sufficient market data [are] available." But he allegedly found no such data.

When asked at trial what he would have considered comparable sales data, Mr. Clark replied: "Sales of mines. Blue clay mines, specifically." He had attached to his appraisal the letter from Mr. Bruchhaus noting that several properties in the Parish had been rezoned for use as "dirt pits." *See supra* p. 13. When asked whether he had "investigate[d]

**[\*27]** those to see what kind of prices they were bought or sold for," Mr. Clark answered, "No." A thorough search for recent property sales would have revealed that Sixty West purchased the Coastal King Clay property—a few miles from the North Donald Tract—for $5,250 an acre in mid-2016 for use as a clay borrow pit. If Mr. Clark discovered that sale, he neglected to mention it in his appraisal.

Rejecting the sales comparison method, Mr. Clark determined the "before value" of the North Donald Tract under the income method, using a discounted cashflow (DCF) approach. In the case of mineral property, he noted that there are two versions of the DCF method. One version, the "owner-operator" or "production income" approach, discounts to present value "the projected income of a landowner that operates a mine." The other version, the "royalty income" approach, discounts to present value "the projected income that a non-operator would receive through royalty payments." According to Mr. Clark, "[c]alculating the present value of the projected income using the Royalty Income [method] would result in a substantially lower [FMV] for a given property, *perhaps 1/10th or less* of the value obtained from the Production Income approach." (Emphasis added.)

Mr. Clark opined that "the Royalty Method [was the] appropriate method" to determine the before value of the North Donald Tract because the partnership and its investors "[did] not possess the knowledge or ability to operate the mine." He acknowledged that the royalties collected by North Donald would be "substantially less than the income of an owner that operates the mine themselves [sic]."

In determining the "before value" of the North Donald Tract using the royalty income method, Mr. Clark adopted Mr. Laporte's assumptions with a few small tweaks. He assumed that 4 million tons of clay would be sold annually, including in the year production commenced. He assumed a royalty rate of $4.50 per ton, toward the lower end of Mr. Laporte's range. He acknowledged at trial that he did not independently investigate or verify the royalty rates assumed by Mr. Laporte. He assumed that the $17.95 million required to purchase wetlands mitigation credits would be paid out of the year 1 cashflow. He assumed a discount rate of 7.5%, at the top of Mr. Laporte's range. Discounting the supposed cashflows from years 2 through 11, he calculated that the NPV of the future royalty stream—and thus the FMV of the North Donald Tract before granting the easement—was $116,302,501.

**[\*28]**  Although Mr. Clark largely rubber-stamped Mr. Laporte's conclusions, his analysis differs radically from Mr. Laporte's in a critical respect.  Mr. Laporte's calculations assume that the landowner would receive via royalties more than 90% of the total NPV of the mining operation.  *See supra* pp. 24–26.  Mr. Clark, by contrast, posited that use of the royalty method "would result in a substantially lower [FMV] for a given property, perhaps 1/10th or less of the value obtained from the Production Income approach."  He posited, in other words, that *the mine operator* would typically receive more than 90% of the total NPV of the mining operation.

If the NPV of the royalties flowing to the landowner were $116 million, the NPV accruing to the mine operator (according to Mr. Clark) should  be about $1 billion.  But Mr. Laporte had calculated the NPV of the entire mining business as only $9.4 million.  This incongruity illustrates the absurdity of the valuation on which petitioner relied.

## XVI.  *Tax Return and IRS Examination*

North Donald timely filed Form 1065, U.S. Return of Partnership Income, for the year ending December 31, 2017.  On that return it claimed a charitable contribution deduction of $115,391,000 for the easement.  It also claimed "other deductions" of $1,157,469, which the return characterized as "investment expenses."  The latter deductions, which did not include any deduction for the tax loss insurance premium, were claimed for the following items:

| Item | Amount |
|---|---|
| "Consulting fee" paid to EvrSource | $1,055,000 |
| Legal fees paid to Morris firm | 50,000 |
| Legal fees paid to Landrum & Landrum | 2,500 |
| Title insurance and deed recording costs | 49,909 |
| Wire fees | 60 |
| **TOTAL** | **$1,157,469** |

North Donald attached to its return the appraisal by Mr. Clark dated March 22, 2018, which valued the easement as of the contribution

[*29] date. Subtracting from the property's assumed "before value" of $116,303,000 its assumed "after value" of $912,000, Mr. Clark determined a value of $115,391,000 for the easement.

North Donald included with its return Form 8283, Noncash Charitable Contributions. This form listed the "donor's cost or adjusted basis" in the North Donald Tract as $804,232 and the "appraised fair market value" of the easement as $115,391,000. An attachment to the Form 8283 explained that the property had been acquired on March 23, 2016, by Reserve at Welsh, which contributed it to North Donald on October 6, 2017.

North Donald also included with its return Form 8886, Reportable Transaction Disclosure Statement. It enclosed this Form pursuant to I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, which required that reportable or "listed" transactions—including specified SCE transactions—be timely disclosed to the IRS. The Form 8886 informed the IRS of facts relating to North Donald's reporting of the transaction.

The Morris firm served as a "material advisor" to North Donald with respect to the SCE transaction. The Morris firm timely filed Form 8918, Material Advisor Disclosure Statement, with the Office of Tax Shelter Analysis. This Form provided to the IRS essentially the same information as the Form 8886 enclosed with North Donald's 2017 tax return.

On August 26, 2021, the IRS issued petitioner a Notice of Final Partnership Administrative Adjustment (FPAA) disallowing in its entirety the deduction claimed for the conservation easement. The FPAA determined that North Donald had not established that it made a contribution or gift in 2017 and had otherwise failed to show that it had satisfied all the requirements of section 170. The FPAA alternatively determined that, if North Donald had complied with applicable regulatory requirements, it had failed to establish that the value of the easement exceeded zero. With respect to this adjustment the IRS asserted a 75% civil fraud penalty under section 6663(a), a 40% penalty for a gross valuation misstatement under section 6662(h), and (in the alternative) a 20% accuracy-related penalty under other provisions of section 6662.

The FPAA also disallowed in their entirety the $1,157,469 of deductions claimed for "other expenses." The IRS determined that North Donald had failed to establish that it had paid or incurred these

**[\*30]** expenses during 2017, that they were ordinary and necessary, or that they were deductible expenses rather than capital expenditures. With respect to this adjustment the IRS asserted a 75% civil fraud penalty under section 6663(a) and (in the alternative) a 20% penalty for negligence or a substantial understatement of income tax.

By Opinion served April 18, 2023, we held that the IRS had secured timely supervisory approval, as required by section 6751(b)(1), for all penalties determined in the FPAA. *See North Donald LA Prop., LLC v. Commissioner*, T.C. Memo. 2023-50.

## XVII. *Tax Court Trial*

On October 1, 2024, Mr. Laporte filed a Motion to Quash the trial subpoena that respondent had issued to him. Stephen Holden and Natalie Riley, two principals of Sixty West, concurrently filed a joint Motion to Quash the trial subpoenas that respondent had issued to them. Counsel for the three prospective witnesses represented that their clients, if called to testify, would invoke their Fifth Amendment privilege against self-incrimination and decline to answer any substantive questions about the transactions at issue. Petitioner then withdrew Mr. Laporte's proposed expert witness report. We granted the Motions, and the Court thus received no fact or expert testimony from these individuals.

### A. *Respondent's Experts*

#### 1. *Craig Benson*

Respondent offered, and the Court recognized, Craig Benson as an expert in geological and geotechnical engineering, including the feasibility of exploiting clay borrow resources. Dr. Benson holds a Ph.D. in civil engineering from the University of Texas and is a member of the National Academy of Engineering, the highest professional recognition an engineer can receive in the United States. He has a long career in academia, including an endowed chair at the University of Virginia, where he served as Dean of the School of Engineering. While at the University of Texas he studied Beaumont clay, a highly plastic clay prevalent along the Louisiana/Texas coast. His professional career has included work with borrow pits and levee construction in Louisiana. We found him to be a credible witness.

Acknowledging that the North Donald Tract contains clays suitable for levee construction, Dr. Benson explained that "[s]imilar soils exist throughout the [property's] undeveloped rural environs." That being

[*31] so, he believed a mine operator would choose a location with a deeper groundwater table to minimize cost. Excavating the North Donald Tract below the water table, he said, would "never be economically viable."

Dr. Benson noted that there was little commercial demand for clay in the Parish and opined that the cost of transporting clay to locations beyond the immediate vicinity would be "excessive." Although there was considerable demand for clay near New Orleans when USACE was repairing levees after Hurricane Katrina in 2005, that demand had subsided by 2017. In any event, he opined that the North Donald Tract was "too far from the levee construction sites to be relevant or economically viable given the extensive clay deposits in southern Louisiana that could be developed as clay borrow sources." In short, he concluded that use of the property as a profitable borrow pit was "highly unlikely and impractical."

## 2. *Neal Rigby*

Dr. Rigby is a mining engineer with 50 years of experience in the international minerals industry. He is employed by SRK Consulting, Inc. (SRK), which has expertise in a wide range of mineral resource and engineering disciplines, with offices in 20 countries on 6 continents. He was a founding partner of SRK's U.K. division and is a member of several professional societies. We recognized him as an expert in mining and mining economics and found him to be a credible witness.

Respondent retained Dr. Rigby to review and critique the mining feasibility study prepared by Mr. Laporte. Dr. Rigby discerned numerous technical flaws in that study. For example, Mr. Laporte supplied "little to no detail" about his mine plan and failed to consider water management, an important consideration because of the high groundwater table on the North Donald Tract. He found no support for Mr. Laporte's assumption that clay mined from the Tract would sell for $10 per ton. He concluded that Mr. Laporte overstated the demand for that clay by including potential projects more than 100 miles away, far beyond the 20–30 mile radius in which trucking costs would be affordable. And he concluded that no mine operator would operate a mine for 12 years for an NPV of $9,444,000 while paying the landowner royalties in excess of $130 million. *See supra* pp. 24–26. "This glaring disconnect," Dr. Rigby stated, "would make it impossible to source/find an experienced contractor prepared to develop and operate a clay mining operation" on the North Donald Tract.

**[\*32]**     3.     *Peter McEnery*

Respondent offered, and the Court recognized, Peter McEnery as an expert in real estate appraisal. Mr. McEnery, a certified real estate appraiser in Louisiana, has decades of experience in valuing land and counseling real estate investors. He holds the Member of the Appraisal Institute (MAI) designation from the Appraisal Institute.

Mr. McEnery noted that the Parish is "heavily tied to the agricultural industry, which is the predominant economic base in this regional market." The most likely purchaser of the North Donald Tract, he concluded, would be an agricultural investor or a farmer. He considered other possible uses for the property, including subdivision development, recreation/hunting, and clay mining. Subdivision development, he concluded, was not feasible due to lack of demand and a stagnant population, and recreational use would produce essentially the same value as agricultural use. He rejected use as a clay borrow pit because it was not a legally permissible use and because his "conversations with local market participants indicated that there was little demand for dirt/borrow pit operations in this regional market."

Concluding that the pre-easement HBU of the North Donald Tract was agricultural, Mr. McEnery employed the comparable sales method to determine its "before value." He identified 9 comparable sales within 19 months of the valuation date, with per-acre prices ranging from $2,313 to $3,609 per acre. The average price was $2,806 per acre.

Mr. McEnery's comparable #4 sold in January 2017 for $3,208 per acre. He discussed this transaction with Trent Gary, the owner, who indicated that the land was initially acquired both for agricultural use and for "some potential clay/sand mining use in two pits located on the property." Mr. Gary indicated that "almost all sand, clay, and topsoil [were] sold locally," that these materials "typically sell at $5.00 per cubic yard," and that clay and sand were generally used "for residential home development" as opposed to "industrial projects or infrastructure projects." Mr. Gary indicated that the clay borrow pit operation "was not a highly lucrative business."

At trial the Court asked Mr. McEnery whether, if there was good-quality clay on the property, it would justify an "uptick by way of adjustment as a possible ancillary use." He replied: "Not really, because it's already baked into the cake, so to speak. All the land has a plausible uptick, because there's clay everywhere." He said he would come to the

[*33] same basic conclusion even if a property had the "world's best clay" because "[t]he world's best clay is next door as well. The world's best clay is across the street."

After making qualitative adjustments to his comparable sales, Mr. McEnery concluded that the "before value" of the North Donald Tract was $755,392, or $2,900 per acre. This figure approximated the price, $2,975 per acre, that Sixty West had paid to acquire the Donald Farm in March 2016. Employing a "paired sales" analysis, he estimated that the conservation easement decreased the property's value by 10%, to $679,853. Subtracting this "after value" from the "before value," he calculated a value of $75,539 for the easement.

4.    *Robert Reilly*

Respondent offered, and the Court recognized, Robert Reilly as an expert in finance, economics, and real property valuation. Mr. Reilly has decades of experience as a certified public accountant, certified business appraiser, and chartered financial analyst. Roughly half his work has involved business valuation, with emphasis on valuation of utility and mining enterprises. As part of his work for utility and railway companies he has valued thousands of easements. He has valued between 12 and 24 conservation easements going back as far as 1984.

Mr. Reilly evaluated the economics of the North Donald transaction from the perspective of a rational investor. He assumed arguendo that a borrow pit could be established on the Tract and yield the volumes of clay posited by Mr. Laporte. But he concluded that Mr. Clark had adopted unsupported inputs for numerous key variables in his valuation, including the royalty rate, the discount rate, the time delay before production could begin, and the application of income tax effects. For example, he noted that the information Messrs. Laporte and Clark cited to support their royalty rate consisted, not of license agreements, but of a marketing brochure and putative letters of intent to purchase clay. And he found Mr. Clark's royalty rate to be "inconsistent with a reasonable profit split between a property licensor and a property licensee."

Mr. Reilly constructed a sensitivity analysis to show how Mr. Clark's bottom line would change if more plausible inputs were used for these four variables. He believed that a reasonable royalty rate would range from $1 to $2 per ton, that a reasonable discount rate would range between 16% and 18%, that 6 to 18 months would pass before production could begin, and that the royalty cashflow would be subject to income

[*34] tax rates between 22% and 32%. In Mr. Reilly's "mid-case scenario," the cumulative effect of these adjustments was to reduce the NPV of the hypothetical future royalty stream to $4.5 million, as opposed to the $116.3 million supposed by Mr. Clark.

### B. *Petitioner's Experts*

#### 1. *Peter Cali*

Peter Cali holds a Ph.D. in civil and environmental engineering from Tulane University and has been a professional engineer in Louisiana for 50 years. He is the former director of the New Orleans Branch of the American Society of Civil Engineers, and his professional career has included work with the USACE Hurricane Protection Office. The Court recognized Dr. Cali as an expert in borrow pit clay mining and levee construction.

Petitioner retained Dr. Cali to "offer recommendations for maximum development of [a] borrow pit" on the North Donald Tract. Dr. Cali believed that the Tract contained a large deposit of clay, while recognizing that similar clay was pervasive on the Pleistocene terrace that underlies the entire region. He stated that he was not "opin[ing] on the commercial viability of the site development," on whether a borrow pit would be profitable, or on whether there would be "enough uses for the material" in the local market.

Dr. Cali identified three levee projects as potential customers for clay from the North Donald Tract. Those projects were in Port Arthur (119 miles away), Orange County (72 miles away), and Abbeville (62 miles away). All three projects are currently operational, but none had been announced as of December 2017. He conceded that these projects could obtain clay from sources much closer than the North Donald Tract.

#### 2. *Stephen Cali*

Stephen Cali, the brother of Dr. Cali, is a civil and structural engineer with 42 years of experience. He maintains an active engineer's license in Louisiana and is a member of several professional societies. The Court recognized Mr. Cali as an expert in borrow pit clay mining design, permitting, and operation.

Petitioner asked Mr. Cali to address the approval and permitting requirements for a clay borrow pit and "provide operational input on the processes and costs of operating [it]." He estimated that 12 million cubic

[*35] yards of clay could be recovered from the North Donald Tract (as opposed to the 44 million figure assumed by Mr. Laporte). He estimated the cost of constructing a mine operation based on cost data prepared for the Big Shake borrow pit near New Orleans.

### 3.    *John H. Brooks*

John H. Brooks is a wetlands delineator with 27 years of experience. He is licensed as a professional wetlands delineator in Virginia. The Court recognized him as an expert in the design, planning, and permitting of mines.

Petitioner retained Mr. Brooks "to conduct a resource evaluation of the proposed North Donald borrow material source area." He concluded that the North Donald Tract contained 54.31 million tons of clay, assuming that a 219-acre pit could be mined to a depth of 100 feet. As a possible market for the clay he identified eight USACE levee projects within a 75-mile radius of the property. The nearest site was approximately 50 miles away.

### 4.    *Kyle A. Catlett*

Petitioner offered, and the Court recognized, Kyle A. Catlett as an expert in real estate valuation. Mr. Catlett, a certified real estate appraiser in Louisiana, has a decade of experience in valuing land. He holds the MAI designation from the Appraisal Institute.

Concluding that the HBU of the North Donald Tract was clay mining, Mr. Catlett used the owner-operator version of the income method to determine its "before value," positing a clay mine with a 12-year life. He assumed that the mine would sell roughly 2 million cubic yards of clay in year 1, ramping up to 2,825,000 cubic yards in years 2 through 9. He projected that the clay would sell for $9.98 per cubic yard in year 1, with 5% annual price increases thereafter. Using a 10.5% discount rate, he calculated $63,835,000 as the NPV of the hypothetical mining business, which he equated to the "before value" of the land.

Alternatively, using the royalty income method and applying a 7.5% discount rate, he determined a "before value" of $41,105,000 for the North Donald Tract. Analyzing sales he deemed comparable, he estimated that the easement decreased the property's value to $325,000, or $1,250 per acre. Subtracting this "after value" from the "before value," he calculated a value of $40,780,000 for the easement.

**[\*36]**                                    OPINION

I.    *Burden of Proof*

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner,* 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner has not satisfied these requirements with respect to any factual issue that has salience in deciding the questions presented. The burden of proof thus remains on petitioner.

II.    *Charitable Contribution Deduction*

   A.    *Conservation Purpose*

As a rule, a taxpayer may not claim a charitable contribution deduction for a gift of property consisting of less than his entire interest in the property. § 170(f)(3)(A). However, a deduction is available if the partial interest constitutes a "qualified conservation contribution." § 170(f)(3)(B)(iii). A "qualified conservation contribution" must be made "exclusively for conservation purposes." § 170(h)(1)(C). The Deed of Easement posits, as one of two conservation purposes, the protection of the North Donald Tract as a relatively natural habitat, identified as an agricultural wetland.

Respondent agrees that preservation of wetlands constitutes a valid conservation purpose. But he contends that, under certain hypothetical scenarios, ACC might be unable to prevent the North Donald Tract from "reverting to its original prairie habitat," in which case it would no longer include wetlands. We reject this argument and conclude that the easement contribution satisfied section 170(h)(1)(C).

**[\*37]** B.  *Application of Section 170(e)(1)*

Section 170(e)(1)(A) provides that the deduction otherwise allowable shall be reduced by "the amount of gain which would not have been long-term capital gain . . . if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution)."  Property whose sale would generate short-term capital gain is sometimes called "ordinary income property."  A deduction for a contribution of "ordinary income property" is typically limited to the donor's cost or adjusted basis in the property.  *See Jones v. Commissioner*, 560 F.3d 1196, 1199 (10th Cir. 2009), *aff'g* 129 T.C. 146 (2007).

Inventory held primarily for sale to customers in the regular course of a trade or business is one type of "ordinary income property."  We have previously held that section 170(e)(1) operated to limit the charitable contribution deduction to the donor's basis where (for example) the easement-encumbered property had been contributed to the PropCo by a real estate developer, which held the land for sale to customers.  *See, e.g.*, *Oconee Landing*, T.C. Memo. 2024-25, at \*47–56; *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*56; *Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2023-82, at \*26–27, *supplementing* T.C. Memo. 2020-148, *aff'd*, No. 23-14039, 2025 WL 1603497 (11th Cir. June 6, 2025).  Respondent does not advance (and could not plausibly advance) that argument here.  Neither the Donald family nor Reserve at Welsh, which purchased the Donald Farm, held the property for sale to customers.

Rather, respondent urges that North Donald was not a valid partnership when Reserve at Welsh contributed the North Donald Tract to it.  At that moment, North Donald's partners were Reserve at Welsh and Legacy West.  In respondent's view, Legacy West was a mere "accommodation party" and should be ignored as a partner because it held "a nominal 1% interest in North Donald."  If North Donald, having only one genuine member, were not a "partnership," it could not tack onto Reserve at Welsh's holding period for the North Donald Tract.  North Donald would then be deemed to have held the property for less than one year, converting it to short-term capital gain property and triggering the application of section 170(e)(1).

A partnership exists when two or more "parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."  *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949).  In *Luna v. Commissioner*, 42 T.C. 1067, 1077–78 (1964), we

[*38] identified eight factors to be considered in assessing the business purpose of the parties to a purported partnership.

We need not tread through these factors here. Even if we were to assign a basis limitation under section 170(e)(1)(A), it would make no difference in the outcome. As explained in greater detail below, we find that the FMV of the conservation easement is $175,842. *See infra* p. 60. North Donald's basis in the North Donald Tract, as reported on its Form 1065, was $804,232. Because the allowable deduction is less than the partnership's basis, a limitation to basis would have no effect.

### C.    *Qualified Appraisal*

Section 170(f)(11) disallows a deduction for certain noncash contributions unless specified substantiation and documentation requirements are met. In the case of a contribution of property valued in excess of $500,000, the taxpayer must obtain and attach to his return "a qualified appraisal of such property." § 170(f)(11)(D). An appraisal is "qualified" if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary." § 170(f)(11)(E)(i).

Respondent agrees that Mr. Clark met most of the statutory and regulatory requirements at the time he prepared the appraisal attached to North Donald's 2017 return.[6] For two reasons, however, respondent urges that the appraisal was not a "qualified appraisal" prepared by a "qualified appraiser."

First, respondent urges that Mr. Clark neglected to follow the Uniform Standards of Professional Appraisal Practice (USPAP) when preparing his appraisal. But we recently held that an appraiser's failure

---

[6] On December 18, 2018, the United States filed a complaint against Mr. Clark and other defendants seeking an order enjoining them from organizing, promoting, or selling abusive SCE transactions. The complaint alleged that Mr. Clark, in preparing appraisals from 2009 onwards, relied on inappropriate assumptions and methodologies to inflate the value of the conservation easements he appraised, resulting in his customers' claiming improper and outsized charitable contribution tax deductions. *See* Complaint at 37, *United States v. EcoVest Cap. Inc.*, No. 18-cv-05774 (N.D. Ga. Dec. 18, 2018), ECF No. 1. On March 20, 2023, Mr. Clark consented to the entry of an injunction barring him from preparing or assisting in the preparation of any appraisal intended to be a "qualified appraisal" within the meaning of section 170(f)(11)(E). *See* Final Judgment of Permanent Injunction Against Defendant Claud Clark III at 2–3, *EcoVest Cap. Inc.*, No. 18-cv-05774 (N.D. Ga. Mar. 20, 2023), ECF No. 419.

**[\*39]** to strictly follow USPAP does not render his appraisal per se "non-qualified." Rather, it is simply a factor to be considered in assessing its persuasiveness. *See Lake Jordan Holdings, LLC v. Commissioner*, T.C. Memo. 2025-123, at \*29; *Jackson Stone South, LLC v. Commissioner*, T.C. Memo. 2025-96, at \*100–01; *Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at \*31–32; *J L Mins.*, T.C. Memo. 2024-93, at \*36–37; *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*48–49, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sept. 2, 2025); *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*27 n.25.

We reach the same conclusion here. Accepting the Commissioner's argument that Mr. Clark's appraisal does not demonstrate full compliance with USPAP, we find that these failures go to the credibility and weight of the appraisal. *See, e.g.*, *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111, at \*29. Because Mr. Clark adopted unreasonable assumptions in preparing his appraisal, we find its credibility and weight to be zero. But the appraisal was not so technically deficient that it lies outside the bounds of accepted appraisal standards.

Second, respondent contends that Mr. Clark was not a "qualified appraiser" by virtue of the "Exception" set forth in Treasury Regulation § 1.170A-13(c)(5)(ii). It provides that an individual is not a qualified appraiser with respect to a particular donation "if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." This will be true, for example, if "the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the [FMV] of the property." *Ibid.*; *see Oconee Landing*, T.C. Memo. 2024-25, at \*39–45 (finding that an appraiser was not "qualified" by virtue of this regulation).

The donor in this case was North Donald, a partnership. In gauging its "knowledge," we look to the knowledge of the persons with ultimate authority to manage the partnership. *See, e.g.*, *Ranch Springs, LLC v. Commissioner*, 164 T.C. 93, 127 (2025); *Jackson Crossroads*, T.C. Memo. 2024-111, at \*25 (collecting authorities). Those individuals were Messrs. Campbell and Pearson, the principals of EvrSource.

The record could support a finding that individuals associated with Sixty West, including Messrs. Mills, Holden, and Nobles, engaged in conduct indicating knowledge that Mr. Clark was likely to overstate the value of the North Donald Tract. Mr. Mills remarked that he felt "like Jed Clampett on this clay ground" upon receiving Mr. Laporte's

**[\*40]** mining feasibility study. Mr. Laporte's emails strongly suggest that Sixty West gave him a target value for the conservation easement. To gin up support for Mr. Laporte's outlandish valuation, upon which Mr. Clark relied, Messrs. Holden and Nobles convinced two small trucking operators to sign letters purportedly agreeing to purchase clay from North Donald. Mr. Holden authorized the payment of up to $30,000 to the nominal signatories of those letters. The principals of Sixty West knew that these letters were not worth the paper they were printed on.

While it appears that Sixty West had knowledge of facts suggesting that Mr. Clark would "falsely . . . overstate" the value of the easement, we are unable to make the same finding about Messrs. Campbell and Pearson, the principals of EvrSource. EvrSource had originally planned to market a different SCE deal using the Diaz property. *See supra* pp. 10–11. EvrSource did not emerge as the "sponsor" of the North Donald transaction until August 2017, after the Diaz deal fell apart. This postdated the preparation of Mr. Laporte's feasibility study and Mr. Clark's engagement as the appraiser. Although Mr. Campbell later asked that "local clay comps" be secured to bolster the appraisal, there is no evidence that he knew Sixty West would gin up fabricated letters from the two truckers.

It is indisputable that Mr. Clark wildly overvalued the North Donald Tract and that his methodology was deficient in many respects. But we are not convinced that North Donald's principals were aware of facts suggesting that Mr. Clark would "falsely . . . overstate" the value of the easement, which requires a showing of deception or collusion. *See Oconee Landing*, T.C. Memo. 2024-25, at \*44–45. EvrSource, not Sixty West, controlled the affairs of North Donald, the donor. The record does not convince us that EvrSource colluded to produce the inflated appraisal prepared by Mr. Clark.

The Commissioner urges us to apply the relevant authorities more broadly, but we decline to do so. *See, e.g., Ranch Springs*, 164 T.C. at 127; *Paul-Adams Quarry Tr., LLC v. Commissioner*, T.C. Memo. 2025-112, at \*38; *Seabrook*, T.C. Memo. 2025-6, at \*32–35; *J L Mins.*, T.C. Memo. 2024-93, at \*38–39; *Mill Road*, T.C. Memo. 2023-129, at \*42–43. The Code elsewhere imposes hefty consequences, in the form of a 40% penalty, for grotesque overvaluations of the sort involved here. *See infra* p. 64. The regulation on which respondent relies focuses on something beyond that—a taxpayer-donor's knowledge that the appraiser would *falsely* overstate the value of the easement. The record does not support a finding that the principals of EvrSource, who

**[\*41]** controlled North Donald, possessed such knowledge. We thus conclude that Mr. Clark, for purposes of this case, was a "qualified appraiser" and that the appraisal attached to North Donald's 2017 return was a "qualified appraisal."

III.    *Valuation*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(a), (c)(1). The regulations have provided, for a very long time, that the FMV of property for charitable contribution purposes is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). This definition, a fixture in the Treasury regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property. *J L Mins.*, T.C. Memo. 2024-93, at \*39.

The FMV of real property should reflect its HBU on the valuation date. *See Mitchell v. United States*, 267 U.S. 341, 344–45 (1925); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). A property's HBU is the most profitable, legally permissible, use for which the property is adaptable and needed, or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington v. Commissioner*, 87 T.C. 892, 897 (1986). If different from the current use, a proposed HBU thus requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985).

To support their positions regarding valuation the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable.

[*42] *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record evidence. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

"Market prices" typically do not exist for conservation easements. *See Symington*, 87 T.C. at 895; *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *30. For that reason, courts usually value easements indirectly using a "before and after" approach, seeking to determine the reduction in property value attributable to the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i); *cf. Browning v. Commissioner*, 109 T.C. 303, 320–24 (1997). Under that approach, the value of the easement is deemed equal to the FMV of the real estate before the easement was granted ("before value"), minus the FMV of the real estate as encumbered by the easement ("after value").

A.     *"Before Value" of the North Donald Tract*

1.     *Prior Transactions Involving the Property*

"The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31; *see Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1233 (1987) ("[T]he price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value . . . ." (citing *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 244 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969))); *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, 110 T.C.M. (CCH) 615, 616–17 (observing that no evidence is more probative of a donated property's FMV than its direct sale price). For example, in *Corning Place*, T.C. Memo. 2024-72, at *28–29, we found that the most persuasive evidence of a property's FMV was its actual sale price 15 months before the contribution. *Accord, e.g.*, *Ranch Springs*, 164 T.C. at 134; *Wortmann v. Commissioner*, T.C. Memo. 2005-227, 90 T.C.M. (CCH) 336, 339–40 (finding that the most persuasive evidence of the property's FMV was its actual sale price 17 months before the contribution).

The record here includes persuasive evidence of this sort. The 260-acre North Donald Tract was carved from the Donald Farm, the

[*43] 3,324-acre parcel Reserve at Welsh purchased in March 2016. The purchase price was $9,888,000, or $2,975 per acre.

Petitioner does not dispute that the Donalds and Reserve at Welsh were unrelated parties dealing at arm's length. But Mr. Catlett, one of petitioner's experts, asserted at trial that the March 2016 transaction was not "a truly arm's length sale" because the Donalds were not "fully knowledgeable" sellers. That was so, in his view, because they allegedly did not know "the amount of the [clay] material in the ground." Opining on the depth of the Donalds' knowledge was outside the scope of Mr. Catlett's expertise. In any event, we find no plausible support for his assertion.

Dan Donald and his brother David testified very credibly at trial. A local realtor informed them that Reserve at Welsh was interested in buying the family farm. The Donalds commissioned an appraisal from a professional who worked with the family's bank. The appraiser identified six comparable sales, ranging in price from $2,200 to $2,700 per acre. Concluding that the offering price of $2,975 per acre was generous, the Donalds accepted the offer.

David Donald knew that the farm had "plenty of clay." He noted that the clay was "at the surface" and thus in plain view. Indeed, the crops the Donalds and the Benoits had chosen to raise were acutely affected by the presence of clay: The clay impeded the farming of soybeans, but it was advantageous for the farming of crawfish and rice. *See supra* p. 4. The clay reserves on the property were used to construct the canals and levees that kept the land saturated, as the farming of rice and crawfish required.

Although the Donald brothers were keenly aware that clay was omnipresent, they were equally aware that there was no commercial market for it. David credibly testified that clay was useful only for building agricultural canals and that local property owners needing clay had abundant supplies on their own land. A lifelong resident of the area, he knew of no commercial borrow pits nearby.

While believing their clay to have little commercial value, the Donald brothers were sophisticated businessmen interested in the geological properties of their land. They had previously commissioned drilling on the farm to search for oil and gas. Although that drilling generated dry holes, the Donalds retained subsurface oil and gas rights when selling the property to Reserve at Welsh. In short, the Donalds were

[*44] clearly knowledgeable about the features of their land that could plausibly generate revenue.

For all these reasons, we conclude that the March 2016 sale was a transaction between "a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2). The transaction occurred reasonably close in time to the valuation date—specifically, one year and 9 months before the easement was granted. We accordingly find that the price at which the 3,324 acres changed hands in March 2016—$2,975 per acre—provides very strong evidence as to the FMV of the North Donald Tract on the valuation date.

## 2. *Other Valuation Methods*

In the absence of actual transactions involving the subject property, courts typically consider one or more of three approaches to determine the property's FMV: (1) the market approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). We consider these methods as providing a check on (or confirmation of) the $2,975 per-acre value indicated by the price North Donald paid to acquire the 3,324-acre parcel. *Cf. Corning Place*, T.C. Memo. 2024-72, at *30–31.

In the case of vacant, unimproved property, the market approach—often called the "comparable sales" or "sales comparison" method—is "generally the most reliable method of valuation." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). The comparable sales method determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions near in time to the valuation date. *See ibid.*; *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g., parcel size and location) and terms of the respective transactions (e.g., proximity to valuation date and conditions of sale). *Wolfsen Land & Cattle Co.*, 72 T.C. at 19.

The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g.,*

[*45] *Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 327 (2013); *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision). Income-based methods are generally disfavored when valuing vacant land that has no income-producing history. *See, e.g.*, *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 324–25 (2012), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part and remanded*, 755 F.3d 236 (5th Cir. 2014). That is so because the absence of a financial track record makes an income-based method inherently speculative and unreliable.

### 3.  *Highest and Best Use*

The choice of valuation method is influenced in part by the HBU of the subject property. We have defined HBU as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Id.* at 331 (quoting Appraisal Institute, *The Appraisal of Real Estate* 277–78 (13th ed. 2008)). In short, to be a property's HBU, a proposed use must be (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. *See Buckelew Farm*, T.C. Memo. 2024-52, at *52.

Because property owners have an economic incentive to put their land to its most productive use, a property's HBU is presumed to be its current use absent proof to the contrary. *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); *Mountanos v. Commissioner*, T.C. Memo. 2013-138, 105 T.C.M. (CCH) 1818, 1819, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016). To establish an HBU different from the current use, a taxpayer must demonstrate both the "closeness in time" and the "reasonable probability" of the proposed use. *Hilborn*, 85 T.C. at 689. In a case such as this, our inquiry entails "an objective assessment of how immediate or remote the likelihood is that the property, absent the [conservation] restriction, would in fact be developed, as well as any effect from zoning . . . laws that already restrict the property's potential highest and best use." Treas. Reg. § 1.170A-14(h)(3)(ii).

The HBU concept "is an element in the determination of fair market value." *Boltar*, 136 T.C. at 336. But it is simply one element. It does not supersede or eliminate the most important prerequisite in determining FMV, namely, that "a hypothetical willing buyer would purchase the subject property for the indicated value." *Ibid.*; *see Corning Place*, T.C. Memo. 2024-72, at *41; Treas. Reg. § 1.170A-1(c)(2).

**[\*46]**                    a.    *Legally Permissible*

The North Donald Tract is in a rural area, surrounded by agricultural land along a bayou and a river. It was zoned A–1 Agricultural, a zoning classification that permitted only farming, recreational use (such as hunting and fishing), and low-density residences (homes on one-acre lots). The property consisted of rice fields and crawfish ponds when North Donald purchased it. The property's presumptive HBU in December 2017 was thus its current use—for agricultural, light residential, and recreational purposes.

Respondent's expert Mr. McEnery considered other possible uses, all of which would have required rezoning. These included higher density residential development, commercial or light industrial use, and use as a clay mining operation. After considering market factors and obstacles to rezoning, Mr. McEnery concluded that the HBU of the North Donald Tract was a continuation of its existing use.

Petitioner contends that the property's HBU in December 2017 was conversion to a clay mining operation. We reject that contention. Because the property was zoned A–1 Agricultural, clay mining was not a legally permissible use. Petitioner submitted no credible evidence to establish a "reasonable probability" that the police jury for the Parish would approve rezoning of the North Donald Tract to permit its use for mining.

North Donald owned the North Donald Tract for 21 months before granting the easement. But it did not submit a rezoning application, secure an occupational license, or take any other step toward securing the zoning change that would be required to conduct mining on the land. We find that Sixty West neglected to take these seemingly obvious steps because (1) it feared that a rezoning application would encounter opposition and (2) it believed these steps would be a waste of money because it had no intention of ever operating a clay mine on the North Donald Tract.

In urging that rezoning was "reasonably probable," petitioner relies—as did Messrs. Clark and Laporte—on two documents. The first is the September 2017 letter from Mr. Bruchhaus. But that letter did not offer an opinion that rezoning to permit clay mining was "reasonably probable." In fact, Mr. Bruchhaus refused to include the word "probable" in his letter despite persistent pressure from Mr. Holden. Rather, Mr. Bruchhaus stated that "all applications are judged on their own merits."

**[*47]** At trial he explained that he included this sentence to ensure that the letter's recipient understood "that this was not just going to be an application that was automatically done."[7]

After Mr. Bruchhaus refused to say that rezoning of the North Donald Tract was "probable," Sixty West secured the October 2017 letter from Mr. Millican. Mr. Millican represented Sixty West in the real estate closing on the North Donald Tract. He later participated in the SCE transaction as a "friends and family" investor, receiving a tax deduction of 15 times his investment.

We find that this letter has no probative value in determining whether rezoning of the North Donald Tract was "reasonably probable." Mr. Millican did not testify at trial. He had had no experience in zoning matters and (as Mr. Bruchhaus credibly testified) "had nothing to do with the Police Jury." We find that Mr. Millican had a personal interest, as Sixty West's lawyer and as a prospective investor, in suggesting that the North Donald Tract could have been rezoned to permit clay mining.

Neither Sixty West nor its agents did any outreach to local residents during 2017 to gauge the level of community support for (or opposition to) a clay mine. Petitioner presented no testimony at trial from any neighborhood representatives. And it presented no testimony from any current or former member of the police jury for the Parish.

The evidence at trial established that neighborhood opposition would likely have materialized. Mr. Benoit, a lifelong resident of the Parish, stated that he would have opposed rezoning of the North Donald Tract. Mr. Drouant, who has worked for USACE in New Orleans for almost 20 years, credibly testified that it was "not uncommon" for local communities to oppose the operation of clay borrow pits in their neighborhoods. As he explained: "Sometimes they don't want to have an empty hole that fills up with water left over after material was removed. They don't want the traffic that can be associated with 50 or more trucks [coming] out of a borrow pit every day," which can "release debris" and leave "clay on the roads." "A lot of times," he said, "they'll engage their

---

[7] This letter seems even less helpful to petitioner given that Mr. Bruchhaus, at Sixty West's request, signed 10 similar letters regarding other properties near the North Donald Tract. Assuming arguendo that neighbors could have been persuaded to support one mine in the neighborhood, it seems unlikely—for economic feasibility and other reasons—that they would have rallied behind 10 mines so near the first. *See Mill Road*, T.C. Memo. 2023-129, at *49 (noting that approval of rezoning of other properties for the same use might impede such approval for the subject property).

[*48] local government representatives and try to stop pits from getting the proper permits or zoning that are required to operate."

For these reasons, we find that petitioner has failed to carry its burden of proving that rezoning of the North Donald Tract to permit mining was "reasonably probable." Because mining was not a legally permissible use of the property in December 2017, the operation of a clay borrow pit cannot have been the property's HBU.

b.    *Financially Feasible*

Even if North Donald could have secured rezoning approval, we find that use of the property as a clay mine was not financially feasible. As we explain more fully below, the royalty and income projections made by Messrs. Laporte, Clark, and Catlett were wildly optimistic and untethered from reality. *See infra* pp. 54–59. Their most significant error, however, was their unsupported assumption that the local market could absorb additional supply of clay in the range of 2.8 million cubic yards annually. Assuming arguendo that this volume of salable clay existed on the property, petitioner has failed to establish "the existence of a market 'that would justify its extraction in the reasonably foreseeable future.'" *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 103 T.C.M. (CCH) 1185, 1190 (quoting *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)), *aff'd*, 744 F.3d 648 (10th Cir. 2014).

The trial evidence established that there was no commercial market for clay in the Parish. Property owners needing clay could almost invariably source the material from their own properties. In hypothesizing future demand for clay from the North Donald Tract, petitioner's experts thus identified as the putative source USACE levee-rebuilding projects elsewhere in Louisiana.

This hypothesis was unreasonable. First, USACE's demand for clay, which peaked after Hurricane Katrina in 2005, had waned considerably by 2017. Mr. Mertens, whom Sixty West recruited to run the Coastal King Clay "show mine," credibly testified that he "scoured" USACE's listings but found no USACE levee projects on which to bid. There were only a few small levee projects in the immediate area, and the clay needed for those projects could be sourced on-site.

Second, given the high cost of transporting clay—one cubic yard weighs a ton—most borrow pits that supply clay for USACE projects are within 10 to 20 miles of the project site. Petitioner's experts repeatedly ignored this fact. Mr. Laporte's study assumed that the North Donald

[*49] Tract would supply clay for projects near New Orleans, which was 140 miles away. Mr. Brooks relied on 8 USACE levee projects within a 75-mile radius of the North Donald property, the nearest of which was 50 miles away. Dr. Cali identified 3 levee projects as potential customers for clay from the North Donald Tract. Those projects were in Port Arthur (119 miles away), Orange County (72 miles away), and Abbeville (62 miles away). All three projects are currently operational, but none had been announced as of December 2017. Dr. Cali conceded that these projects could obtain clay from sources much closer than the North Donald Tract.

Third, as USACE determined in July 2018, the North Donald Tract consisted almost entirely of wetlands subject to USACE jurisdiction. As Mr. Drouant from USACE explained, the New Orleans District generally avoided sourcing clay from wetlands, both because of the adverse environmental impact and because of the cost of purchasing mitigation credits, which made the borrow pit uneconomical. Given the ready availability of clay all along the Louisiana coast, he explained that "[i]t's easier to find somewhere else nearby that's not wetlands." And whereas petitioner's experts hypothesized a borrow pit up to 100 feet deep, 30 feet is the typical depth of borrow pits that supply clay for USACE projects. Digging deeper intensifies water infiltration, which increases costs and may render the clay unsuitable for levee construction.

In short, petitioner's assumptions about the potential market for clay from the North Donald Tract are unsupportable given the laws of supply and demand. Contractors who bid on levee projects naturally select a source for clay closest to the project site. Witnesses at trial, including USACE officers, agreed that it is not difficult to source clay for levee construction in Louisiana. Contrary to the assertions of petitioner's experts, no rational contractor would source clay from a wetlands borrow pit 50 to 140 miles away when clay was abundantly available in the immediate neighborhood.

Wholly apart from USACE requirements, the wetlands affected the financial feasibility of a borrow pit in another way. In performing its soil analysis of the North Donald Tract, TWE encountered groundwater at depths ranging from 0.0 feet (the surface level) to 17.8 feet, with the "moisture content of the soil samples rang[ing] from 12.0% to 57.3%." It accordingly advised Sixty West of the need for further analysis of "borrow source considerations such as existing groundwater levels,

[*50] in-situ soil moisture contents, [and] moisture-density relation-ships." Sixty West ignored that advice.

As Dr. Rigby, one of respondent's geological experts, noted, Mr. Laporte failed to consider water management and the increased costs it would impose in terms of equipment and manpower. "With the proposed Clay Mining operation to a depth of 100 feet," Dr. Rigby explained, "the management of in-pit water will be a critical issue." Sixty West's own people acknowledged that a mine would "be into the water table at 12' to 15', so any soil removal below that point will become problematic." Mr. Benson, respondent's other geological expert, opined that a rational mine operator would choose a location with a deeper groundwater table to minimize cost. Excavating the Tract below the water table, he said, would "never be economically viable."

After considering market factors and obstacles to rezoning, Mr. McEnery (respondent's expert) concluded that the HBU of the North Donald Tract was a continuation of its existing use as currently zoned. Petitioner has submitted no plausible evidence to controvert that con-clusion. We accordingly accept Mr. McEnery's opinion that the HBU of the North Donald Tract in December 2017 was agricultural, low-density residential, and recreational use.

4.  *Comparable Sales Approach*

The comparable sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valu-ation date." *Savannah Shoals*, T.C. Memo. 2024-35, at *36. This method is usually the most reliable indicator of value when sufficient information exists about sales of properties resembling the subject prop-erty. *See United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, com-parable sales constitute the best evidence of market value."); *Whitehouse Hotel*, 139 T.C. at 324–25 (stating that other valuation methodologies are "not favored if comparable-sales data are available").

The comparable sales method is based on the "principle of substi-tution." It stands for the proposition that "the value of a property can be estimated at the cost of acquiring an equally desirable substitute." *Mill Road*, T.C. Memo. 2023-129, at *51; *see Buckelew Farm*, T.C. Memo. 2024-52, at *50 n.25, *55 ("[T]he principle of substitution . . . stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less."); *Estate of*

[*51] *Rabe*, 34 T.C.M. (CCH) at 119 ("[A] prudent man will pay no more for a given property than he would for a similar property.").

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24). That is so because "the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe*, 34 T.C.M. at 119).

This general rule applies with no less force when the unimproved property sought to be valued has the potential for mineral development. *See J L Mins.*, T.C. Memo. 2024-93, at *58; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *38; *Savannah Shoals*, T.C. Memo. 2024-35, at *35. The comparable sales method is perfectly capable of capturing transactions involving such property. If the market for clay was as robust as petitioner contends, one would expect that mining companies and investors would be on the lookout to acquire property in the area. This demand would cause land prices in the neighborhood to drift upwards.

Correctly concluding that the HBU of the North Donald Tract was its existing use, Mr. McEnery searched for transactions involving similarly sized agricultural parcels. He selected nine transactions involving comparable parcels, generating an average sale price of $2,950 per acre, which he adjusted to $2,806 per acre for various reasons. But he believed that emphasis should be given to the first three comparable sales he identified. They occurred in the Parish and neighboring Acadia Parish near in time to the valuation date:

- Comparable #1: Mr. McEnery's first comparable was the sale of a 626-acre parcel in Acadia Parish for $2,684 per acre in May 2017. The transaction involved three land parcels used for farming rice and other crops.

- Comparable #2: Mr. McEnery's second comparable was the sale of a 344-acre parcel in Welsh for $2,995 per acre in April 2017. The property had historically been used for agricultural purposes, but the seller retained 50% of the mineral rights.

- Comparable #3: Mr. McEnery's third comparable was the sale of a 344-acre parcel on West Niblett Road in Welsh for $2,910 per acre in March 2017. The property is located on the same road as the North Donald Tract. It was zoned for agricultural use.

[*52]  We find no flaws in Mr. McEnery's approach, and we find his bottom line to be firmly supported, not only by the comparable transactions he selected, but also by the historical record relating to valuation of land in the Parish.  First and foremost, Reserve at Welsh purchased the Donald Farm, from which the North Donald Tract was carved, in March 2016.  It purportedly purchased the farm for its potential as a clay mine, the HBU petitioner alleges for the property.  The purchase price was $2,975 per acre, virtually identical to the unadjusted figure ($2,950 per acre) that Mr. McEnery derived from his comparable sales analysis.

Before agreeing to sell the farm, the Donald brothers commissioned an appraisal from a trusted professional who worked with their bank.  That appraiser was presumably incentivized to find the best possible comparables, which would give his clients leverage to negotiate the highest possible sale price.  The seven comparable transactions he found indicated that a per-acre price in the range of $2,200 to $2,700 would be reasonable.  That evidence convinced the Donaldses that Reserve at Welsh's offering price—$2,975 per acre—was generous.

The record includes two prior appraisals of the acreage from which the North Donald Tract was carved.  Both were prepared by professional appraisers in a commercial (as opposed to a litigation) context, having been obtained by Reserve at Welsh in connection with bank loans secured by the property.  In March 2016 Mr. Bunting determined that the FMV of the original 3,324-acre tract was $10,294,428, or $3,097 per acre.  In July 2017 Mr. Davis determined that the FMV of a 2,378-acre portion of the tract was $6,658,400, or $2,800 per acre.  Both were "fair market value" appraisals positing agricultural use as the HBU and valuing the property using sales of comparable vacant land.

Ms. Manuel was the real estate broker who introduced the Donald brothers to Reserve at Welsh.  She has been a licensed real estate professional since 2009, concentrating her practice in the Parish.  She credibly testified that, in transactions in which she was involved, the highest price ever paid for agricultural land in the Parish was $3,500 per acre.  She confirmed that land prices in the Parish were stable during 2015–2020, climbing only "a little bit" during that period.  She listed about a dozen factors that affect the prices paid for land in the Parish.  The factors she listed did not include the presence of clay.

Entities affiliated with Sixty West acquired during 2016 two other farms in the Parish—the Houssier Farm and the Theriot Farm.  Both were purportedly purchased for their potential for development as

[*53] clay borrow pits. Sixty West paid $3,000 per acre for the Houssier Farm, which comprised roughly 2,000 acres adjacent to the Donald Farm. Sixty West paid $2,850 per acre for the Theriot Farm, an 800-acre tract that Ms. Manuel described as being "a little bit further up the road" from the Donald Farm.

The record includes only one transaction pointing to a per-acre price above the price range discussed above. That was the mid-2016 transaction whereby an entity owned by Mr. Lacy—Sixty West's "boots on the ground" in the Parish—acquired 235 acres for development as a commercial borrow pit called Coastal King Clay. This property was located several miles from the Donald Farm. The purchase price was $5,250 per acre.

For three reasons, we give this transaction little or no weight. First, neither petitioner nor any of its experts urge that we consider the Coastal King Clay transaction a comparable sale that should factor into a comparable sales analysis. To the contrary, Mr. Catlett dismissed the comparable sales method in one paragraph of his 489-page report, in essence asserting that the existence of clay on the North Donald Tract made the property unique and hence incomparable. As the evidence at trial conclusively established, the presence of clay on land along the Louisiana Gulf coast does not make the land unique; it makes the land fungible.

Second, insofar as petitioner alleges clay mining as the property's HBU, there is no evidence that the Coastal King Clay tract was truly comparable to the North Donald Tract. As noted by respondent's experts and by Mr. Drouant from USACE, the high water table on the North Donald Tract (most of which was wetlands) made the property an inferior choice for use as a clay borrow pit. *See supra* pp. 49–50. In theory at least, the Coastal King Clay tract was better suited for use as a borrow pit because, according to a DEPS employee, it was "better situated, dry, and more cost effective."

Third, Sixty West caused Mr. Lacy to acquire the Coastal King Clay tract because (as Mr. Mills explained) "it would sure be awesome to have an operating mine in [our] portfolio for IRS purposes." In other words, Sixty West hoped that a "show mine" in the neighborhood would lend support to its position that clay mining in the Parish was commercially feasible. Mr. Mills also believed that a nearby mine might help convince skittish investors that Sixty West's easement valuations were plausible. Animated by these very peculiar objectives, Sixty West may

**[\*54]** have agreed to pay a higher price per acre than the average "willing buyer" of land in the Parish.

In sum, the historical evidence—of which there is a great deal—consistently supports Mr. McEnery's determination that the North Donald Tract at year-end 2017 was worth less than $3,000 per acre. In the light of this evidence, we give greatest weight to the price Reserve at Welsh actually paid for the acreage in March 2016. We accordingly find that the "before value" of the North Donald Tract was $774,928 (260.48 acres × $2,975 = $774,928).

### 5. *Income Approach*

Dismissing the sales comparison approach, Messrs. Clark and Catlett employed the income approach—often called the "income capitalization" method—to determine the "before value" of the North Donald Tract. The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g., Chapman Glen Ltd.*, 140 T.C. at 327; *Marine*, 92 T.C. at 983. As noted earlier, income-based methods are generally disfavored when valuing vacant land that has no income-producing history. *See supra* pp. 44–45. We have often noted "the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings." *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision).[8]

Two versions of the income approach, both employing a DCF methodology, have surfaced in SCE cases involving land with mining as the alleged HBU. The first is the "owner-operator method." Under this approach, the pre-easement value of the land is determined by discounting to present value the cashflows an owner-operator supposedly could derive by constructing and operating a mining business on the property. *See Ranch Springs*, 164 T.C. at 117. The second is the "royalty income method." This method posits that the landowner would lease the land to a mine operator, then determines the land's pre-easement value by

---

[8] As we noted in an earlier SCE case where mining was the alleged HBU, valuing undeveloped property using the income method is especially tenuous where the entities that would conduct the putative mining business "were shell companies—passthrough [entities] owned by investors seeking tax deductions" that "had no employees, management, or mining experience." *Excelsior Aggregate*s, T.C. Memo. 2024-60, at \*46. Mr. Clark conceded that North Donald and its investors "[did] not possess the knowledge or ability to operate the mine."

**[\*55]** calculating the discounted present value of the royalty payments the landowner might receive from the operator. *Ibid.*

Although Messrs. Clark, Laporte, and Catlett deployed the income method in different (and inconsistent) ways, all necessarily assumed that the HBU of the North Donld Tract was conversion to a clay borrow pit. We have rejected that assumption because petitioner failed to establish that mining was a legally permissible use (or was reasonably likely, by virtue of a zoning change, to become a legally permissible use in the near future). The DCF analyses employed by petitioner's experts thus fall of their own weight.

Even if mining were thought to be the property's HBU, we would reject the income capitalization approaches deployed by petitioner's current and former experts.[9] Mr. Laporte began his feasibility study by using the owner-operator version of the income method to determine an NPV for a hypothetical mining business on the North Donald Tract. *See supra* pp. 24–26. Mr. Catlett did the same in one section of his report. Using the owner-operator approach, he calculated $63,835,000 as the NPV of the hypothetical mining business, then equated the value of the land to that. *See supra* p. 35.

As we have recently held, that equation was erroneous as a matter of law. *See Ranch Springs*, 164 T.C. at 153 ("[E]quat[ing] the value of the land with the going concern value of a . . . mining business conducted on the land . . . defies economic logic and common sense."); *J L Mins.*, T.C. Memo. 2024-93, at \*63 (noting that the owner-operator version of the DCF method "[does] not valu[e] the property at all, but what a speculative business could do with the property"). A knowledgeable willing buyer would not pay, for one of the assets needed to conduct a mining business, the entire projected value of the business.

In the alternative, petitioner urges that the "before value" of the North Donald Tract should be determined using the "royalty income method." This was the method Sixty West had seized upon as early as March 2017. Mr. Mills regarded the royalty approach as attractive because he viewed it as having just three main variables—the price per ton paid for the clay, how many tons would be purchased, and how quickly those tons would be purchased. As he stated in a March 2017

---

[9] As noted *supra* p. 26, Mr. Laporte prepared the mining feasibility study that underlay Mr. Clark's appraisal. But petitioner withdrew Mr. Laporte's proposed expert report after he indicated that he would invoke his Fifth Amendment privilege against self-incrimination if called to testify.

[*56] email:  "If we have a royalty deal we don't have hardly any work to do because the royalty contract will outline the amount they'll buy per year.  Royalty is a very clean way to go."

Mr. Clark duly opined that "the Royalty Method [was the] appropriate method" to determine the before value of the North Donald Tract, positing that the partnership and its investors "[did] not possess the knowledge or ability to operate the mine."  Discounting to present value the royalties the Tract's owner would supposedly receive from a putative mine operator, Mr. Clark calculated the NPV of the future royalty stream—and thus the FMV of the North Donald Tract before granting the easement—as $116,302,501.  Employing the royalty income method but using different assumptions, Mr. Catlett calculated the NPV of the hypothetical future royalty stream as $41,105,000.

In theory at least, the royalty income method provides (as compared with the owner-operator method) a more plausible basis for valuing undeveloped property whose genuine HBU is mining.  That is so because it focuses on the landowner's contribution to the putative mining venture—access to the minerals underneath the land.  *See Ranch Springs*, 164 T.C. at 155 (finding that mining companies often choose to acquire access to a mineral site by lease, not by purchase).  In other words, the royalty income method seeks to isolate the value of the land, rather than equating the value of the land with the projected value of a mining business conducted on the land.

Before assessing the substance of Mr. Catlett's royalty income valuation, we note some threshold problems with his report.  He asserts that he considered various sources of information in reaching his conclusions, but he does not identify them.  He states that he "spoke with several individuals knowledgeable with . . . clay/borrow pits," "gathered market information from . . . various other sources," and "gathered market data regarding product pricing, costs, royalty rates and discount rates."  His report does not identify those individuals or the sources of the market data he consulted.

During cross-examination Mr. Catlett refused to divulge (or was unable to identify) the sources of his information.  This lack of transparency is problematic:  It handicapped respondent's cross-examination, and it complicates the Court's evaluation of his data.  In response to questions posed by respondent's counsel and the Court, it became clear that Mr. Catlett was simply parroting petitioner's litigating position—that the HBU of the North Donald Tract was clay mining and that the

**[\*57]** comparable sales method is inapposite. "Experts lose their usefulness and credibility when they merely become advocates for the position argued by a party." *See Paul-Adams Quarry Tr.*, T.C. Memo. 2025-112, at \*96 (quoting *Zarlengo v. Commissioner*, T.C. Memo. 2014-161, 108 T.C.M. (CCH) 155, 165).

Mr. Catlett's report fares no better when we consider its substance. Lacking reliable historical data, an appraiser using the income method to value raw land must inevitably rely on a lengthy series of assumptions, projections, estimates, and guesstimates. For that reason, the Court must scrutinize the plausibility of the critical assumptions made by the appraiser. *See Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820. Each assumption, whether large or small, carries with it "some risk of error." *Whitehouse Hotel*, 139 T.C. at 323. As interdependent assumptions multiply, the risk of error can increase exponentially: "[R]elatively minor changes in only a few of [an expert's] assumptions [can] have large bottom-line effects." *Ibid.* Mr. Reilly's sensitivity analysis illustrates this problem well. *See supra* pp. 33–34.

Mr. Catlett assumed that the mine operator would pay North Donald a royalty equal to 18% of gross revenue from sales of clay. The trial evidence showed that royalty rates for different types of minerals vary widely, both in their magnitude and the manner in which they are computed. As support for his 18% figure, he presented the following table in his report:

| *Material* | *Royalty Payment* | *Location* |
|---|---|---|
| Bluestone | 20% of gross revenue | Pennsylvania |
| Limestone | 7% FOB Sales | Georgia |
| Limestone | 7% FOB Sales | Alabama |
| Sand | 13.6% FOB Sales | Florida |
| Limestone | 10% FOB Sales | Florida |
| Limestone | Base rent with annual 4% increase, with 5% FOB Sales | Alabama |
| Fill Dirt | 15% | Florida |

This table is an egregious example of Mr. Catlett's failure to supply information. He supposedly derived the rates listed above by contacting mining companies and speaking with "persons [with] knowledge

[*58] about royalty payments." But he lists only the State in which the royalties were allegedly paid, omitting the identities of the payor and the payee, the precise mine location, and the year of payment. He omitted these items "due to the confidential nature of royalty rates." Without the underlying sources and persons identified, Mr. Catlett's royalty rates are an ipse dixit.

In any event, Mr. Catlett's supposed royalty rate of 18% is an "exercise in imagination." *See J L Mins.*, T.C. Memo. 2024-93, at *65. Notably missing from his report are any royalty rates from Louisiana and any royalty rates for clay. He does not explain why royalty rates for bluestone, limestone, sand, and fill dirt are comparable to royalty rates for clay. His "analysis" is one sentence long: "Based on the previous [rates] I am of the opinion that a Royalty rate of 18% per annum to a non-owner operator landowner is reasonable and supportable." This is the classic testimony of a hired gun posing as an expert. The central component of a royalty income calculation is the royalty rate, and we find Mr. Catlett's 18% rate to be unsupported.

We find equally unreasonable Mr. Catlett's estimate that the North Donald Tract would produce 2.8 million cubic yards of clay annually for 9 years, after a 1-year ramp-up period. This estimate assumed a borrow pit 80 feet deep, against Peter Cali's conclusion that mining to an 80-foot depth "would be difficult and possibly impractical because of the high water table." Mr. Catlett assumed that the mine would operate 224 days per year, 9 hours a day, with 80 dump trucks departing the site each hour. This was double Stephen Cali's projection of 360 dump trucks per day.

Mr. Catlett projected that each cubic yard of clay would sell for $9.98 f.o.b. mine in year 1 and that this price would increase by 5% annually. He arrived at his $9.98 figure by conducting a "market survey," for which he again supplied no underlying data. His price exceeds the prices quoted by Stephen Cali, one of petitioner's experts, which ranged from $5.50 to $7.00 per cubic yard. And his price exceeds the prices advertised in the Big Shake marketing brochure, which asserted that the company could sell clay for $4 to $6 per ton—and that was near New Orleans, not in the Parish.

Mr. Catlett likewise supplied no evidence to support a 5% annual price increase. He based this figure on data from an unidentified company and "historical trends at other mining properties I have appraised over the years," which he likewise declined to identify. Contrary to his

**[\*59]** projections, historical pricing for clay had been relatively flat during the period preceding the valuation date. According to U.S. Geological Survey reports, clay prices had increased by only 4.6% from 2012 to 2017, or roughly 1% annually.

In discounting projected future royalties to present value, Mr. Catlett used a 7.5% discount rate. This approximated the rate used by Messrs. Clark and Laporte. But Mr. Laporte acknowledged that the average discount rate he derived from a survey of 21 established mining companies was 11.16%, and that discount rates he derived from "the sale of operating quarries" ranged from 10% to 15.5%. Believing that a reasonable discount rate would range between 16% and 18%, Mr. Reilly concluded that Mr. Catlett's 7.5% discount rate essentially "assumes a risk-free investment." An investment in North Donald—a partnership owned by investors who knew nothing about mining and were simply purchasing tax deductions—was anything but "risk-free." Mr. Catlett's failure to make a risk premium adjustment to account for North Donald's fledgling status suggests that his goal was to generate the highest valuation possible. *See J L Mins.*, T.C. Memo. 2024-93, at \*63 ("Where the income approach lacks good inputs, it becomes little more than fan fiction aimed at generating the highest numbers possible, no matter how objectively ludicrous.").

In sum, assuming arguendo that clay mining was the HBU of the North Donald Tract and that the royalty income DCF method could appropriately be used to value it, we find Mr. Catlett's $41,105,000 "before value" to be unsupported and insupportable. Mr. Clark's $116,302,501 royalty income valuation can only be described as ludicrous by comparison.

### B. *"After Value" of the North Donald Property*

Mr. Catlett opined that the "after value" of the North Donald Tract—that is, its value as encumbered by the easement—was $325,000, or $1,250 per acre. In seeking comparable sales, he operated under the assumption that agricultural use after the easement was "still physically possible . . . , albeit to a lesser legal extent." Relying on transactions involving comparable agricultural properties, but operating free of the assumption that the Deed of Easement meaningfully restricted agricultural uses, respondent's expert Mr. McEnery opined that its "after" value was $679,853, or $2,610 per acre.

**[\*60]** Because the Deed of Easement permitted the continued conduct of most agricultural activities—apart from cattle farming and sugar cane production, for which the North Donald Tract was unsuited anyway—we think Mr. McEnery chose the better universe of potential comparables. Making a few tweaks to his analysis, we conclude that the "after value" of the North Donald Tract was $2,300 per acre. The fact that North Donald sold the Tract for $2,500 per acre in 2021 is consistent with our conclusion.

### C. *Value of the Easement*

We have determined that the "before value" of the North Donald Tract was $774,928, or $2,975 per acre. We conclude that its "after value" was $599,104, or $2,300 per acre (260.48 acres × $2,300 = $599,104). The value of the easement is thus $175,824.

## IV. *Other Deductions*

North Donald claimed on its 2017 return $1,157,469 of "other deductions," which it characterized as "investment expenses." Respondent disallowed these expense deductions in toto. We sustain the disallowance.

Section 162(a) generally allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Taxpayers have the burden of proof to substantiate any deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 83–84. Section 709(a) provides that "no deduction shall be allowed . . . to [a] partnership or to any partner for any amounts paid or incurred to organize a partnership." The statute likewise disallows any deduction for "syndication expenses," i.e., expenses incurred "to promote the sale of (or to sell) an interest in such partnership." *Ibid.*

Organizational expenses include "fees for services incident to the organization of the partnership." Treas. Reg. § 1.709-2(a). Syndication expenses include "legal fees . . . for securities advice and for advice pertaining to the adequacy of tax disclosures in the . . . placement memorandum." *See id.* para. (b). Organizational expenses, but not syndication expenses, may be amortized if properly elected by the taxpayer. *See* § 709(b); Treas Reg. § 1.709-2(b).

The largest deduction North Donald claimed was the $1.055 million "consulting fee" paid to EvrSource. EvrSource was the sponsor of the SCE transaction. It formed North Donald Investors as the InvestCo

**[*61]** and marketed the deal by assembling the subscription booklet for distribution to investors. The fee paid to EvrSource was thus nondeductible as an organizational and/or syndication cost. *See* § 709(a); Treas. Reg. § 1.709-2(b) ("Syndication expenses are expenses connected with the . . . marketing of interests in the partnership."). Petitioner has not carried its burden of proving that any portion of EvrSource's fee could properly be characterized as something other than an organizational and/or syndication cost.

North Donald claimed a $50,000 deduction for legal fees paid to the Morris firm. The promoters retained the Morris firm to provide a tax opinion relating to the SCE transaction, and the firm acknowledged that it served as a "material advisor" to the transaction. On October 16, 2017, the firm issued its tax opinion, finding it "more likely than not the allocations of income, gains, losses, and deductions (including the contribution deduction) . . . will be respected for Federal income tax purposes."

In *Surloff v. Commissioner*, 81 T.C. 210, 245 (1983), we held that expenses incurred for the preparation of a tax opinion accompanying an offering memorandum constituted a "syndication or selling expense." As we explained, "[t]he tax opinion letter was an integral part of the offering prospectus and was certainly included therein to facilitate the sale of partnership interests. Indeed, we doubt that any investor would have purchased interests in the partnerships had there not been representations made regarding the tax advantages of doing so." *Ibid.* We accordingly hold that the $50,000 fee paid to the Morris firm constituted a nondeductible syndication expense.

The balance of North Donald's "other deductions" totaled $52,469. *See supra* p. 28. It submitted no evidence at trial to substantiate these remaining expenses or to prove that they were "ordinary and necessary" expenses of the partnership (as opposed to capital expenditures). And it advanced no argument with respect to these items in its Posttrial Briefs. We accordingly deem it to have waived any claim to these deductions.

V.     *Penalties*

A.     *Fraud Penalty*

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment due to fraud. The Commissioner has the burden of proving fraud, and he must prove it by clear and convincing

**[\*62]** evidence. *See* § 7454(a); Rule 142(b); *Richardson v. Commissioner*, T.C. Memo. 2006-69, 91 T.C.M. (CCH) 981, 996, *aff'd*, 509 F.3d 736 (6th Cir. 2007).[10]

To sustain his burden the Commissioner must establish two elements: (1) that there was an underpayment of tax for each year at issue and (2) that at least some portion of the underpayment for each year was due to fraud. *Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983). If the Commissioner proves that some portion of an underpayment was due to fraud, then the "entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that the balance was not so attributable. § 6663(b).

Fraud is intentional wrongdoing designed to evade tax believed to be owing. *Neely v. Commissioner*, 116 T.C. 79, 86 (2001). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977). Fraud is not to be presumed or based upon mere suspicion. *Petzoldt v. Commissioner*, 92 T.C. 661, 699–700 (1989). But because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. *Id.* at 699. The Commissioner satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Parks v. Commissioner*, 94 T.C. 654, 661 (1990).

In deciding whether North Donald and its managers engaged in conduct "intended to conceal [or] mislead" the IRS, we place great weight on the disclosures attached to its return. It included with its return a Form 8283, listing the "donor's cost or adjusted basis" in the North Donald Tract as $804,232 and the "appraised fair market value" of the easement as $115,391,000. It also included with its return Form 8886. It enclosed this Form pursuant to an IRS Notice which required that reportable or "listed" transactions—including SCE transactions of the sort involved here—be timely disclosed on the tax return. As a "material advisor" to the transaction, the Morris firm timely filed Form 8918 with the Office of Tax Shelter Analysis. This Form disclosed to the IRS essentially the same information as the Form 8886 enclosed with North Donald's return.

---

[10] We previously ruled that the IRS satisfied the supervisory approval requirement for the fraud and other penalties determined in the FPAA. *See supra* p. 30.

**[\*63]** Addressing the applicability of the fraud penalty in *Mill Road*, T.C. Memo. 2023-129, at \*58, we stressed the importance of the express disclosure on the tax return of the principal facts about the SCE transaction. By enacting section 170(f)(11), which requires inclusion of the "appraisal summary," Congress sought to facilitate the "Commissioner's efficient identification of overvalued property." *Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at \*17. When a taxpayer claims a charitable contribution deduction for recently purchased property, a wide gap between cost basis and claimed value raises a red flag suggesting that the return merits examination. By including in its return an accurate Form 8283—reporting a basis of $804,232, an easement value of $115,391,000, and a mere 15 months between the acquisition and valuation dates—North Donald sent that message loud and clear. When the taxpayer's return says (in effect) "please audit me," the Commissioner has an uphill battle to prove that the taxpayer engaged in conduct "intended to conceal [or] mislead" the IRS." *Parks*, 94 T.C. at 661.

Respondent acknowledges that North Donald and its managers did not manifest many of the traditional "badges of fraud." *See, e.g., Schiff v. United States*, 919 F.2d 830, 833 (2d Cir. 1990) (per curiam) (listing badges of fraud); *Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601. But he contends that the "managers knew that the conservation easement was not worth $115,391,000." And he urges that certain individuals involved in the transaction engaged in disreputable and suspect conduct.

We agree with both of those propositions. But we do not think they suffice—given the explicit disclosures on the face of the return—to satisfy respondent's heavy burden of proving fraud. Mere knowledge that a deduction is overstated—even wildly overstated—does not prove fraudulent intent when the return itself informs the Commissioner of the critical facts. And as we concluded earlier when addressing the "qualified appraiser" issue, most of the questionable conduct was engaged in, not by people associated with EvrSource, but by people associated with Sixty West. *See supra* pp. 39–40.

In ascertaining the taxpayer's intent in a partnership proceeding, we commonly look to conduct of the partnership's managers. *See Buckelew Farm*, T.C. Memo. 2024-52, at \*60 (examining conduct of partnership's managers to determine applicability of fraud penalty); *Mill Road*, T.C. Memo. 2023-129, at \*58 (same). EvrSource, not Sixty West, controlled the affairs of North Donald, the donor. The record does not convince us that the principals of EvrSource, Messrs. Campbell and

[*64] Pearson, engaged in fraudulent activity or colluded in producing Mr. Clark's inflated appraisal. We accordingly conclude here, as we have in other SCE cases, that the civil fraud penalty does not apply. *See Lake Jordan Holdings*, T.C. Memo. 2025-123, at *55–56; *Buckelew Farm*, T.C. Memo. 2024-52, at *57; *Mill Road*, T.C. Memo. 2023-129, at *56–57.

B. *Other Penalties*

The Code imposes a 20% penalty for an underpayment of tax required to be shown on a return that is attributable to "[a]ny substantial valuation misstatement." § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. § 6662(h)(2)(A)(i).

The value North Donald claimed for the easement was $115,391,000. We have determined that the value of the easement was only $175,824. Because the claimed value exceeded the correct value by $115,215,176, more than 200% of the correct amount, the valuation misstatement was "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* § 6664(c)(3) (first sentence). The 40% penalty thus applies to the portion of North Donald's underpayment attributable to claiming a charitable contribution deduction in excess of $175,824.

Respondent also seeks a 20% penalty for an underpayment due to negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2). This penalty would apply to the portion of any underpayment not attributable to the valuation misstatement. *See Oconee Landing*, T.C. Memo. 2024-25, at *75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, 122 T.C.M. (CCH) 343, 343). Because North Donald is entitled to a charitable contribution deduction of $175,824, there could be no underpayment attributable to claiming a

**[\*65]** deduction in that amount. We thus consider the applicability of the 20% penalty to the portion of the underpayment resulting from our conclusion that North Donald is not entitled to "other deductions" of $1,157,469.[11]

The 20% penalty applies to the portion of an underpayment attributable to negligence or disregard of rules or regulations. § 6662(a) and (b)(1). The existence of negligence is determined at the partnership level. *See Oakbrook Land Holdings, LLC v. Commissioner*, T.C. Memo. 2020-54, 119 T.C.M. (CCH) 1351, 1360; Treas. Reg. § 301.6221-1(c). Negligence includes any failure "to keep adequate books and records or to substantiate items properly." Treas. Reg. § 1.6662-3(b)(1).

It should have been obvious to North Donald that the fees paid to EvrSource (for promoting and marketing the SCE deal) and to the Morris firm (for preparing a tax opinion for distribution to prospective investors) were nondeductible syndication expenses. *See supra* pp. 60–61. And North Donald's failure to keep adequate records to substantiate the other claimed deductions is prima facie evidence of negligence. *See* Treas. Reg. § 1.6662-3(b)(1).

The "reasonable cause" defense may be asserted against the negligence and substantial understatement penalties. The determination of reasonable cause is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The partnership bears the burden of proving that it had reasonable cause and acted in good faith. *See Higbee v. Commissioner*, 116 T.C. 438, 449 (2001).

North Donald asserts reliance on professional advice as the basis for this defense. *See* Treas. Reg. § 1.6664-4(b)(1). Reliance on professional advice will absolve a taxpayer only if it establishes that it fully disclosed all relevant facts to the return preparer, that the errors on the return were a result of the preparer's mistakes, and that it actually relied on the preparer's advice in good faith. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *Estate of Goldman v. Commissioner*, 112 T.C. 317, 324 (1999),

---

[11] The determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level because partnerships do not pay tax. *Plateau Holdings*, 122 T.C.M. (CCH) at 343. However, we can determine at the partnership level *the applicability* of the penalty. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018); *Oconee Landing*, T.C. Memo. 2024-25, at \*75; *Plateau Holdings*, 122 T.C.M. (CCH) at 343.

**[*66]** *aff'd sub nom. Schutter v. Commissioner*, 242 F.3d 390 (10th Cir. 2000) (unpublished table decision).

Petitioner offered no plausible evidence to show that North Donald had reason to believe it was entitled to the "other deductions" claimed on its returns or that its managers "exercised ordinary business care and prudence" in taking those tax positions. *See Crimi v. Commissioner*, T.C. Memo. 2013-51, at *99. Nor has petitioner proven that North Donald fully disclosed all relevant facts to the return preparer or that the errors on the return were a result of the preparer's mistakes. *See Neonatology Assocs.*, 115 T.C. at 99. We accordingly reject the reliance-on-professional-advice defense with respect to North Donald's "other deductions."

We have considered all the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*